# VIRGIN ISLANDS CONSERVATION SOCIETY, INC., Petitioner

## v.

# VIRGIN ISLANDS BOARD OF LAND USE APPEALS and VIRGIN ISLANDS: COASTAL ZONE MANAGEMENT COMMISSION, Respondents, and SUGAR BAY LAND DEVELOPMENT, LTD., Intervenor

Civil No. 87/339

District Court of the Virgin Islands

Div. of St. Croix

June 13, 1994

192

GORDON C. RHEA, ESQ., Christiansted, St. Croix, V.I. and ROBERT G. DREHER, ESQ., (Sierra Club Legal Defense Fund), Washington, DC, *for Petitioner*

KEVIN A. RAMES, ESQ., (KEVIN A. RAMES, P.C.), Christiansted, St. Croix, V.I. and ELISABETH R. SAUER, ESQ., (LASHLY, BAER & HAMEL, P.C.), Kansas City, MO, *for Respondent/Intervenor Sugar Bay Land Development, Ltd.*

BROTMAN, *District Judge*[1]

## OPINION ON WRIT OF REVIEW

This action is before the court on Virgin Islands Conservation Society's ("VICS" or "the petitioner") petition for writ of review of the decision of the Coastal Zone Management Committee ("CZM Committee") granting Sugar Bay Land Development, Ltd.'s ("Sugar Bay") application to build a hotel and marina, and the Board of Land Use Appeals (the "Board") decision affirming the CZM Committee.[2] For the reasons set forth below, the actions of the CZM Committee and the Board are vacated and remanded with directions.

## I. FACTUAL AND PROCEDURAL BACKGROUND

At the center of this case is a struggle between environmental conservation and economic development. The stage on which this struggle is set is Salt River Bay, an area located on the north shore of the island of St. Croix, United States Virgin Islands.

Salt River has garnered numerous accolades, including:

(1) designation as a National Natural Landmark by the United States and Virgin Islands governments;

---

[1] The Honorable Stanley S. Brotman, United States District Court for the District of New Jersey, sitting by designation.

[2] The date, respondents CZM Committee and the Board have declined to participate in those proceedings. Sugar Bay petitioned for leave to intervene, which this court granted on January 25, 1988.

193

(2) inclusion on the Department of the Interior's National Inventory of Critical Wetlands;

(3) partial designation as a National Historical Landmark; and most recently,

(4) establishment as the Salt River Bay National Historical Park and Ecological Preserve at St. Croix, Virgin Islands, by the United States Congress. Omnibus Insular Areas Act of 1992, P.L. 102–247.[3]

As one can easily deduce, Salt River's primary claim to fame is historical and ecological. As the earliest spot under the United States flag associated with Christopher Columbus, and the haven for numerous archeological artifacts, Salt River Bay is renowned for its historical value. E.g., R. App. 479–524.[4]

The present dispute, however, focuses on the ecological implications of developing Salt River Bay. Salt River is an area of unparalleled beauty and ecological bounty, serving as a unique crossroads for endangered ocean, reef, and fresh water habitats. Its beauty has long attracted the attention of developers. In the 1960's, and again in the 1970's, developers started and subsequently abandoned construction on the site. R. App. 296; Transcript, CZM Committee, Oct. 10, 1986, at 4. Unfortunately, their haphazard and ultimately doomed attempts at development permanently damaged the fragile ecostructure. See, e.g., R. App. 296, 397. This sour experience may explain the depth of community opposition to the latest attempt to develop the area.

In July 1986 Sugar Bay applied for permits under the Coastal Zone Management Act, V.I. Code Ann. tit. 12, § 901 et seq., to build a 288-unit hotel and convention center, 300-unit condominium complex, and a 157-slip marina on 75 acres of land along Salt River Bay. In support of its application, Sugar Bay submitted an Environmental Assessment Report ("EAR") detailing the environmental

---

[3] Passing this legislation proved to be an empty gesture, as Congress never appropriated money to buy the parkland from landowners such as Sugar Bay. See Transcript, Oral Argument, Oct. 26, 1993, at 12.

[4] "R. App." designates citations to the three volume appendix Sugar Bay submitted on appeal to the Third Circuit Court of Appeals. See infra, text accompanying note 8 (describing procedural history of this case).

impact of the development and planned mitigation measures.[5] See R. App. 278–596.

Despite substantial community and intragovernmental opposition, see, e.g., R. App. 107–73; Transcript, CZM Committee, Oct. 30, 1986, at 47–89, the CZM Committee approved two permits—one for the land portion[6] and another for the marina portion of the development[7]—but imposed a number of conditions. See R. App. 174–84 (land permit); R. App. 185–97 (water permit). VICS appealed to the Board of Land Use Appeals, which affirmed the CZM Committee, but added certain conditions of its own. R. App. 198-209.

VICS then petitioned for a writ of review, which this Court dismissed for untimeliness without addressing the merits. See Virgin Islands Conservation Society, Inc. v. Virgin Islands Board of Land Use Appeals, Civil No. 1987–339 (D.V.I. July 31, 1988). The dismissal was subsequently reversed by the Third Circuit Court of Appeals, and remanded for a decision on the merits.[8] See Virgin Islands Conservation Society, Inc. v. Virgin Islands Board of Land

---

[5] An "Environmental Assessment Report" is an informational report prepared by the permittee available to public agencies and the public in general which . . . shall be considered by the Commission prior to its approval or disapproval of an application for a major coastal zone permit. Such report shall include detailed information about the existing environment in the area of a proposed development, and about the effects which a proposed development is likely to have on the environment; an analysis and description of ways in which the significant adverse effects of such development might be mitigated and minimized; and an identification and analysis of reasonable alternatives to such development.
V.I. Code Ann. tit. 12, 5 902(o).

[6] Major coastal zone permit No. CZX-98-86L was issued to construct a 288 unit hotel, 300 condominium units, a convention center, a swimming pool, tennis complex, lobby building and related infrastructure.

[7] Major coastal zone permit No. CZX-98-86W was issued to dredge an area 8 feet deep, to construct a 157 slip marina and perform related activities, and to dredge a channel to the entrance to the marina site within the Salt River Bay Basin. Because the water permit was never ratified by the Virgin Islands Legislature, as required under the CZMA, it may no longer be effective. R. App. 185; Transcript, Oral Argument, Oct. 26, 1986, at 23.

[8] Review of this case was postponed at both parties' request pending the passage of federal legislation to establish a national park at Salt River. After Congress passed the legislation without providing the necessary financing, see note 3, supra, the court proceeded with its review and heard oral argument on October 26, 1993. Transcript, Oral Argument, Oct. 26, 1993, at 12–13.

Use Appeals, 881 F.2d 28 (3d Cir. 1989). Accordingly, the Court is back to the same point as in 1989—poised to review the granting of the permits by the CZM Committee and its affirmance by the Board.[9]

## II. THE STANDARD OF REVIEW

Before turning to the standard of review in this case, it is necessary to outline the decision-making structure of the permitting process. The CZM Commission consists of the Commissioner of the Department of Planning and Natural Resources ("DPNR") and the Director of the Virgin Islands Planning Office, both ex officio members, and fifteen citizen members appointed by the Governor and approved by the Legislature. V.I. Code Ann. tit. 12, § 904(a). Of the fifteen, five reside in St. Thomas, five in St. John, and five in St. Croix. Id. The five members of each island constitute a Committee of the Commission. Id. at § 904(b).[10]

Persons aggrieved by the decision of a CZM Committee may appeal to the Board of Land Use Appeals. Id. at § 914(a). The Board may decide the appeal only on the record of the proceedings before the CZM Committee. V.I.R. & Regs. tit. 12, § 914–10(a). The Board may hold a hearing in which the parties argue their respective cases, and may also accept briefs from the parties and amici. V.I. Code Ann. tit. 12, § 914(c); V.I.R. & Regs. tit. 12, §§ 914–3(c)–(d); 914–8.

The Board's decision must be in writing and must include findings of fact and conclusions of law. V.I. Code Ann. tit. 12, § 914(d); V.I.R. & Regs. tit. 12, § 914–10(a). If the Board grants an application for a permit, it may also impose conditions to ensure compliance with the "objectives and purposes" of the VICZMA. V.I. Code Ann. tit. 12, § 914(d). Once appeal to the Board is exhausted, any person aggrieved by the grant or denial of an application may then petition this court for review. Id. at § 913(d); V.I.R. & Regs. tit. 12, § 914–20.

---

[9] Reviewing the agencies' actions required sifting through a voluminous record spanning over a decade, as well as numerous briefs and supplemental briefs submitted by amici curiae and the parties themselves. Amici submitting briefs in this action include the National Wildlife Federation, the National Parks and Conservation Association, the League of Women Voters of the Virgin Islands, the St. Croix Landmarks Society, Inc., and the Christopher Columbus Jubilee Committee, Inc.

[10] In this case, the Committee involved was from St. Croix.

The identity of the issues before this court, as well as the appropriate standard of review, are disputed. Sugar Bay contends that the "only issue before the District Court" is "whether the Board of Land Use Appeals was correct in its conclusion that the Coastal Zone Management Commission had 'substantial evidence' before it which could support approval of [Sugar Bay's] Joint Application and issuance of the two major coastal zone permits." Sugar Bay Supplemental Brief [hereinafter "Resp't's Supp. Br.] at 4–5 (citing Lewes Dairy, Inc. v. Freeman, 401 F.2d 308, 317 (3d Cir. 1968)).

This court disagrees. Properly framed, the issues on review are whether the CZM Committee and the Board:

(1) approved the project despite the failure of the developer to provide information concerning the environmental impact of the project necessary to meet its burden of proving that the project was consistent with the goals, policies and standards of the VICZMA and contained all feasible mitigation measures, as required by V.I. Code Ann. tit. 12, § 910(a)(2);

(2) failed to assure that the project would comply with applicable water quality standards, as required by V.I. Code Ann. tit. 12, § 906(b)(5) and § 911(c), and whether the Board exceeded its statutory authority when it ordered the Division of Environmental Protection to issue a water quality certification;

(3) failed to recognize properly the Salt River estuary's status as an "Area of Particular Concern" under the VICZMA or, alternatively, failed to adhere to the CZM Commission's own management guidance for the area; and

(4) improperly approved the project despite the fact that the dredging and construction authorized by the permits would cause substantial impacts on sensitive coastal resources, in violation of the environmental goals and policies of the VICZMA.

■ In reviewing the actions of the CZM Committee and the Board, the court must, in effect, apply two standards of review: "the first to be applied by the Board to the CZM Committee's decision, and the second to be applied by this Court to the Board's actions." Conservation Society v. Board of Land Use Appeals, 21 V.I. 516, 519 (D.V.I. 1985).

The standard of review applied by the Board to CZM Committee actions authorizes the Board to review any decision or action of the

197

Committee in which the findings, inferences, conclusions, or decisions are:

 (a) in violation of constitutional, Organic Act of 1954, or statutory provisions;

 (b) in excess of the statutory authority of the Commission, Committee, or Commissioner;

 (c) made upon unlawful procedure;

 (d) affected by other error of law;

 (e) erroneous in view of the reliable, probative, and substantial evidence on the whole record; or

 (f) arbitrary, capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

V.I.R. & Regs. tit. 12, § 914–3.

In reviewing decisions of the Board on appeal, this court must "determine[] whether the Board correctly applied the appropriate standard." Conservation Society v. Board of Land Use Appeals, 21 V.I. at 520. This court must accordingly determine:

 (1) Whether the agency acted within the limits of its statutory powers;

 (2) Whether the agency applied the relevant law correctly;

 (3) Whether the agency findings are supported by substantial evidence on the record; [and]

 (4) Whether the agency has abused its discretion by acting in an arbitrary or capricious manner.

See Perry v. Government Employees Service Comm'n, 18 V.I. 524, 527 (D.V.I. 1981); Branch v. Bryan, 18 V.I. 54, 56 (D.V.I. 1980). Thus, the substantial evidence standard urged by Sugar Bay is but one of four standards of review that this court may apply.[11] The choice of

---

[11] As indicated supra, Sugar Bay contends that the court is limited to determining whether substantial evidence exists to support the CZM Committee granting the permit. This position not only contravenes Virgin Islands caselaw, see supra, but also fundamental principles of administrative law.

 Administrative agencies, by their very nature, enjoy a substantial amount of discretion. See Kenneth C. Davis, Administrative Law Treatise § 3.3 (2d ed. 1978). The judicial role in reviewing agency action is very limited—generally the court will defer to the expertise of the agency, and will not perform a de novo review. Thus, even if the court would have arrived at a different result, it will not second-guess the agency.

 Agency discretion is not without limits, however. The degree of discretion accorded administrative agencies necessitates that the administrative process

which standard to apply depends upon the nature of the claim of error.

## III. THE VIRGIN ISLANDS COASTAL ZONE MANAGEMENT ACT

The authority and procedures for the CZM Committee to review applications to develop the Virgin Islands coastline rests in the Virgin Islands Coastal Zone Management Act of 1978 ("VICZMA"), V.I. Code Ann. tit. 12, § 901 et seq. and its implementing regulations at V.I.R. & Regs. tit. 12, § 901 et seq.[12]

The VICZMA requires the CZM Committee, when considering a permit application, to reconcile two mutually antagonistic goals: to preserve coastal resources, while simultaneously promoting economic development.

Thus, the VICZMA calls for the CZM Committee to "protect, maintain, preserve and, where feasible, enhance and restore, the overall quality of the environment in the coastal zone, the natural and man-made resources therein, and the scenic and historic resources of the coastal zone for the benefit of residents and visitors of the Virgin Islands." V.I. Code Ann. tit. 12, § 903(b)(1). In the same breath, the VICZMA calls for the "promot[ion of] economic development and growth in the coastal zone" by, inter alia, "managing: (1) the impacts of human activity and (2) the use and development of renewable and nonrenewable resources so as to maintain and enhance the long-term productivity of the coastal environment." Id. at § 903(b)(2).

In the likely event that the CZM Committee faces a conflict between these two goals, the conflict must be resolved "in the manner which is the most protective of significant coastal resources."[13] Id. at § 905(e).

------

conform to agency rules and regulations, the Constitution, statutes, and the common law. Richard J. Pierce, Jr., et al., Administrative Law and Process 219 (1985). Accordingly, ensuring procedural integrity serves as the touchstone of judicial review of agency action. See id. at 221–23. To restrict the court then, as Sugar Bay argues, to an examination of the underlying facts would eviscerate the review process.

[12] Enactment of the VICZMA was prompted by passage of the Coastal Zone Management Act, 16 U.S.C 1451 et seq. (the "Federal CZMA"), which offers financial aid to states that develop Coastal Management Plans. See § IV.C., infra.

[13] At one point Sugar Bay implies that the CZMA grants absolute priority to water-dependent development over all other use of the coastal zone, including conservation. R. App. 244-45. The VICZMA, by its express terms, confers priority for coastal-dependent development *only* as against "other development in the coastal zone." V.I. Code Ann. tit. 12, § 903(b)(3). Thus, if the CZM Com-

## IV. DISCUSSION

A. *Imposition of Conditions on the Permit*

The first issue before this court is whether the CZM Committee and the Board approved the project despite the failure of the developer to provide information concerning the environmental impact of the project necessary to meet its burden of proving that the project was consistent with the goals, policies and standards of the VICZMA and contained all feasible mitigation measures, as required by V.I. Code Ann. tit. 12, § 910(a)(2).

> The CZM Committee may issue a permit only after finding that (A) the development is consistent with the basic goals, policies, and standards provided in sections 903 and 906 of this chapter; and (B) the development as finally proposed incorporates to the maximum extent feasible mitigation measures to substantially lessen or eliminate any and all adverse environmental impacts of the development; otherwise the permit application shall be denied.

Id. at § 910(a)(2).

Furthermore, where an applicant, like Sugar Bay, intends to develop submerged and filled lands,[14] the CZM Committee must also find, inter alia:

> (1) that the application is consistent with the basic goals of section 903 and with the policies and standards of section 906 of this chapter; (2) that the grant of such permit will clearly serve the public good, will be in the public interest and will not adversely affect the public health, safety and general welfare or cause significant adverse environmental effects; (3) that the occupancy and/or development to be authorized by such a permit will enhance the existing environment or will result in

---

mittee were faced with two applications competing to develop the same site, the water-dependent project, e.g., a marina, would prevail over the non-water-dependent project, e.g., an office building.

[14] The VICZMA defines "submerged and filled lands" as

all lands in the Virgin Islands permanently or periodically covered by tidal waters up to, but not above, the line of mean high tide, seaward to a line three geographical miles distant from the coastline of the Virgin Islands, and all artificially made, filled in, or reclaimed lands, salt ponds and marshes which were formerly[,] permanently or periodically covered by tidal waters. V.I. Code Ann. tit. 12, § 902(cc).

minimum damage to the existing environment; (4) that there is no reasonably feasible alternative to the contemplated use or activity which would reduce the adverse environmental impact . . . (5) that there will be compliance with the Virgin Islands territorial air and water quality standards; [and] (6) that the occupancy and/or development will be adequately supervised and controlled to prevent adverse environmental effects.

Id. at § 911(c). The burden is placed on the developer to demonstrate compliance with these requirements. Id. at § 910(a)(2).

The CZM Committee may impose conditions on an applicant before issuing a permit. Id. at § 910(a)(3); 12 V.I.R. & Regs. tit. 12, §§ 910–7(d), 910–11(b). But granting a permit before the applicant has complied is prohibited unless the CZM Committee is assured of future compliance and "the applicant has demonstrated in writing why the condition cannot be partly or fully complied with before issuance of the permit." V.I.R. & Regs. tit. 12, § 910–11(b) (emphasis added). Significantly, however,

if any condition of a major Coastal Zone Permit requires the applicant to submit a plan for satisfaction of a condition to the Division of Coastal Zone Management and/or to the Committee for review and approval, no Coastal Zone Permit shall be issued until such plan(s) has been reviewed and approved.

Id. at § 910–11(c) (emphasis added).

The CZM Committee conditioned the granting of the permit on, inter alia, Sugar Bay: (1) developing a plan to preserve the salt pond and wetlands; (2) financing an update of the existing management guidance plan including a supplement indicating the project's impact on the environment; (3) developing an Erosion Sediment Control Plan; (4) submitting an Oil Spill Contingency Plan; (5) performing a monitoring plan for water quality control; (6) submitting and performing a study on the status and conditions of the water table in the eastern Salt River watershed and addressing the effect on the water table by the desalination operation; (7) preparing an archaeological survey; (8) providing more specific criteria defining "augmented flushing" of the marine basin, including the volume of supplementary flushing, quality of flushing materials, and a discussion of potential impact from such flushing; (9) conducting an analysis on the effects of dumping 255,000 gallons of brine daily into the marine basin; and (10) conducting a baseline

201

coliform study with monthly readings of the water quality. None of these conditions had to be met before the permits were issued. R. App. 177, 180–81 (Permit No. CZX-98-86L, ¶¶ 6(b), (d), (e), (v), (w), (dd), (ii), (jj), (kk), (ll)); R. App. 188–89, 191–93 (Permit No. CZX-98-86L, ¶¶ 6(b), (d), (o), (t), (dd), (ee), (jj), (qq)).

The CZM Committee found that once these conditions were met, the project would, inter alia, "be consistent with the goals and policies of the" VICZMA and "the requirements for the occupancy of submerge[d] land." Transcript, CZM Committee, Dec. 4, 1986, at 62, 96.

Petitioner contends that the CZM Committee could not have fulfilled its statutory mandate under V.I. Code Ann. tit. 12, § 910(a)(2) "[b]ecause the conditions to Sugar Bay's permit are designed to generate the very information necessary to determine the project's impact."[15] Petitioner's Supplemental Brief [hereinafter "Pet'r's Supp. Br."] at 8.

Raising a similar issue, the petitioners in Confederated Tribes v. FERC objected to the licensing of a hydropower project by the Federal Energy Regulatory Commission ("FERC"), arguing that by issuing the license with a condition that further study be done, the FERC violated its statutory obligation to consider the environmental impact of the project prior to licensing. 746 F.2d 466 (9th Cir.), cert. denied, 471 U.S. 1116 (1984).

The Ninth Circuit agreed. The court first noted that it "cannot and should not attempt to substitute its judgment for that of the [agency]. But we must decide whether the [agency] has correctly discharged its duties. . . . The [agency] must see to it that the record is complete [and] has an affirmative duty to inquire into and consider all relevant facts." Id. at 472 (quoting Scenic Hudson Preservation Conference v. FPC, 354 F.2d 608, 620 (2d Cir. 1965), cert. denied, 384 U.S. 941 (1966)).

Applying these principles, the court held that by (1) issuing the license without requiring the licensee to submit a fish and wildlife report, and (2) deferring study and resolution of fish protection issues pending the resolution of a parallel proceeding, the FERC had violated its statutory mandate to consider, before issuing a license, the effect of the hydropower project on fishery resources and possible mitigative measures. Id. at 471, 473.

---

[15] The remaining conditions, which impose specific performance standards, are unopposed by petitioner. Transcript, Oral Argument, Oct. 26, 1993, at 22.

■ Like the FERC, the CZM Committee is statutorily required to gauge the environmental impact of each project and to explore possible mitigative measures before granting a permit. V.I. Code Ann. tit. 12, § 910(a)(2). Requiring the submission of plans implicitly acknowledges an absence of information.[16] Until those plans and studies were submitted, the record before the CZM Committee was necessarily incomplete.[17] Thus, as in Confederated Tribes, the CZM Committee abdicated its statutory obligations by granting a permit without inquiring into all relevant facts.[18]

Contrary to Sugar Bay's assertion, the availability of enforcement measures in no way acquits the CZM Committee of its statutory obligations. See R. App. at 243–44. Many of the plans and studies required by the CZM Committee are not subject to approval by any government agency nor do they require anything more than the mere submission of information. See, e.g., Permit No. CZX-98–86L ¶¶ 6(b), (d), (v), (w), (jj), (ll); Permit No. CZX98–86W ¶¶ 6(b); (d); (o); (jj); (qq). Without performance standards or approval requirements, any CZM Committee enforcement effort would be fruitless. Moreover, ex post enforcement is obviously an imperfect guarantor, because penalties only kick in once the damage is done.

Deferring the review of plans and studies until after a permit is issued creates twin evils: the tendency to tolerate more environmental harm once development has begun, and the incentive for applicants to present the CZM Committee with a fait accompli by delaying the submission of the requested information. See Confederated Tribes, 746 F.2d at 471, 473.

---

[16] Even Sugar Bay has conceded the need for further study and examination. R. App. 654 (Sugar Bay "freely concedes that additional study is not only important but necessary.") (citing Transcript, CZM Committee, Oct. 30, 1986, Testimony of William Bruce, Managing Partner of Sugar Bay, at 8).

[17] Under V.I. Code Ann. tit. 12, § 910(d)(1), the CZM Commissioner is charged with determining whether an application is complete. See also V.I.R. & Regs. tit. 12, § 910–7(a). Sugar Bay implies that acceptance of the application by the commission forecloses any further inquiry into the adequacy of the record. Resp't's Supp. Br. at 12–13. Any such implication must obviously be rejected.

[18] The CZM Committee also violated a principal goal of the CZMA, which is to involve the public in planning coastal zone conservation and development. V.I. Code Ann. tit. 12, § 903(b)(11). Granting the permit before receiving the plans and studies deprived the public of the opportunity to comment on the result.

After time and money have been invested, and construction has begun, an agency will likely tolerate more environmental harm than before. Id. at 471 (quoting Environmental Defense Fund v. Andrus, 596 F.2d 848, 853 (9th Cir. 1979)). Realizing this, applicants have no "incentive to submit all the required data as quickly as possible." Id. at 473. Indeed, the applicant "may very well attempt to forestall the imposition of protective measures" until the project reaches such an advanced stage that such measures would be financially and practically infeasible.[19] See id.

Adequate review and investigation of permit applications serves as the linchpin of the VICZMA. To ensure adequate review, the legislature requires the CZM Committee to make certain findings before ever issuing a permit. Accordingly, the Committee must acquire all information reasonably necessary before making the delicate judgments required by the VICZMA.

For these reasons, this court holds that no permit may issue until all necessary studies and plans have been submitted and approved by the Division of Coastal Zone Management and/or the Committee.[20] Accordingly, the court vacates the action of the CZM Committee as well as the Board's affirmance and remands this matter to the Committee for further proceedings. On remand, no permit may issue until the CZM Committee or other appropriate government agency has reviewed and approved the plans and studies outlined

---

[19] For example, plans relating to the effect of the dredging and operation of the marina were required to be submitted before dredging, rather than construction, began. Sugar Bay had previously threatened to abandon the project if the marina could not be built. See, e.g., R. App. 266–67. Picture this scenario: construction begins, substantial time and money are spent, and Sugar Bay finally gets around to submitting the necessary information. The plans and studies reveal such serious impacts on water quality that development should not proceed. The CZM Committee is then faced with an intractable choice: to indefinitely, even permanently halt construction, to impose costly mitigation measures, or to allow the developer to proceed.

Requiring all plans and studies to be submitted before issuing a permit avoids such a scenario, and ensures that the policies of the CZMA are strictly adhered to by all concerned. Most important, it guarantees that all information needed to judge the impact of the development on the environment is available to the CZM Committee before it makes its decision.

[20] Plans which are not needed to facilitate the CZM committee's responsibilities under the VICZMA, such as documents relating to the acquisition of subpermits, are not encompassed by this holding. See e.g., R. App. 180, Permit No. CZX-98-66L, ¶ 6(dd) (requiring submission of an Oil Spill Contingency Plan).

supra. The Committee must then review the application de novo, taking into account the newly submitted information.

■ Should the CZM Committee decide on remand to issue permits to Sugar Bay, certain deficiencies present in the original proceeding must be avoided. First, the Committee never required Sugar Bay to explain in writing why the conditions could not be satisfied before the permit was issued. See V.I.R. & Regs. tit. 12, § 910–11(b)(2).[21] Such a violation of its own regulations was arbitrary and capricious. See Confederated Tribes, 746 F.2d at 474; see also United States v. Nixon, 418 U.S. 683, 694–96 (1974) (An agency's failure to abide by its own regulations is arbitrary and capricious.). Accordingly, Sugar Bay must explain why it cannot comply before the Committee may issue a permit with conditions attached.

■ Second, the CZM Committee never found, as required by the VICZMA, that "the development as finally proposed incorporates to the maximum extent feasible mitigation measures to substantially lessen or eliminate any and all adverse environmental impacts of the development."[22] See V.I. Code Ann. tit. 12,

---

[21] VICS has failed to establish that the CZM Committee violated Section 910–11(c) of the Virgin Islands Rules and Regulations, which forbids issuing a permit if any condition requires the applicant to submit a plan to the Division of Coastal Zone Management and/or to the Committee for review and approval. Section 910–11(c) contains an obvious loophole—it only applies to plans which require review and approval by the CZM Committee. Because the permit never required Sugar Bay to submit the plans for review and approval, the Committee could not have violated the regulation. The court notes that today's holding closes this loophole by effectively adding a corollary to Section 910–11(c)—if any condition of a major Coastal Zone Permit requires the applicant to submit a plan or study, the plans and studies must be reviewed and approved by the Division of Coastal Zone Management and/or the Committee before the permit is issued.

[22] In attempting to excuse this lapse, Sugar Bay resorts to two arguments. First, Sugar Bay argues that the very fact that the CZM Committee issued the permit means that all requisite findings were made. Alternatively, Sugar Bay argues that the Board satisfied the statutory requirement by explicitly making the finding in its own decision. Both arguments must fail.

The CZM Committee is required under its regulations to provide a written summary of its action, its findings and conclusions, and any conditions attached thereto. V.I.R. & Regs. tit. 12, § 910–7(d). Apparently, rather than providing a written summary, the Committee adopted and read the recom-

205

§ 910(a)(2)(B). Accordingly, on remand the CZM Committee must make this finding and explain its basis before issuing any permits.

## B. *Water Quality Certification*

VICS contends that the CZM Committee erred in issuing permits to Sugar Bay despite an "explicit finding" by the Division of Environmental Protection[23] ("the Division") of the Virgin Islands Department of Planning and Natural Resources[24] "that the project could violate applicable water quality laws." Pet'r's Supp. Br. at 16. VICS further contends that the Board overstepped its authority by ordering the Department to issue a water quality certification against its will. Pet'r's Supp. Br. at 17–19.

Before a permit may issue, the CZM Committee must find that the proposed development "will be [in] compliance with the Virgin Islands territorial air and water quality standards." V.I. Code Ann. tit. 12, § 911(c)(5). To that end, the Committee distributes copies of each permit application to various agencies, including the Division, for their review. Transcript, Board of Land Use Appeals, Aug. 2, 1987, at 23–24.

The Division is charged with enforcing the Virgin Island laws protecting water quality and plays a dual role in the application review process. V.I. Code Ann. tit. 12, §§ 183–184. The Division's primary role is to review proposed development projects to determine if such projects would be consistent with the territory's water quality standards, and to report its findings to the CZM Committee. Transcript, Board of Land Use Appeals Hearing, July 22, 1987, at 16.

---

mended findings and conclusions of the CZM staff into the record. See Transcript, *CZM Committee*, Dec. 4, 1986.

If issuing a permit is predicated on making certain findings, the CZM Committee must explicitly set forth those findings on the record. However, nowhere does the Committee find that "the development as finally proposed incorporates to the maximum extent feasible mitigation measures to substantially lessen or eliminate any and all adverse environmental impacts" or its equivalent. Furthermore, the statute specifically requires the CZM Committee, not the Board, to make the necessary findings. See V.I. Code Ann. tit. 12, §§ 910(a)(2); 911(c). Thus, the Board's findings of fact cannot substitute for findings that the Committee itself was required to make.

[23] Previously titled the "Division of Natural Resources." Transcript, Board of Land Use Appeals, July 22, 1987, at 16.

[24] Previously titled the "Department of Conservation and Cultural Affairs." V.I. Code Ann. Tit. 12, § 182 (Supp. 1993).

The Division's secondary role is to issue water quality certifications under Section 401 of the Clean Water Act, 33 U.S.C. § 1341. Section 401 requires applicants for any federal license or permit for an activity that may result in a discharge into navigable waters to obtain a certification from the relevant State that the proposed discharge will comply with State water quality standards. Id.

The Division issued on October 26, 1986 a report entitled "COASTAL ZONE PERMIT APPLICATION WATER QUALITY REVIEW AND CERTIFICATION," denying water quality certification to the Sugar Bay project. The report stated in pertinent part:

4. WATER QUALITY CERTIFICATION: Denied, the proposed dredging could degrade the water quality in the marina basin, adjacent bay, and Salt River Submarine Canyon. This could cause violations of the V.I. Environmental Laws and Regulations, Title 12, Chapter 7, Subchapters 186–3(b)(1) Dissolved Oxygen, 186–3(b)(11) Color and Turbidity, and 186–7 Antidegradation. See number six below.

5. ADDITIONAL INFORMATION REQUESTED FOR CERTIFICATION: If dredging is permitted by the C.Z.M. Committee and the U.S. Army Corps of Engineers despite this denial, please submit a detailed monitoring plan to [the Division] for review and approval before dredging starts. The . . . plan must insure that in the event of a violation of water quality standards, or if any degradation of surrounding ecosystems . . . occurs, dredging will stop and action will be taken to correct the cause of the violation/degradation before dredging can resume. Any violations or degradation detected must be reported to [the Division] immediately. Page 51 of the applicant['s] EAR refers to "organic wetting agents" to increase the water and effluent nutrient holding capacity of the soil. Detailed information on this product must be supplied in order to evaluate its potential effects on water quality and marine life.

6. COMMENTS OR SPECIAL RESTRICTIONS: Proir [sic] to any land clearing or construction, erosion control devices must be in place and inspected with approval by [the Division]. This will aid in preventing violations of [various water quality laws]. In order to comply with these laws the applicant must agree to stop all work if a violation is occurring and devote all man power [sic] to finding its source and eliminating it.

R. App. 105–06.[25]

Later in the report, the Division spelled out the dangers posed by the proposed project, and the water quality standards likely to be violated. R. App. 106. It further outlined the "inconsistencies" between the Sugar Bay proposal and Virgin Islands environmental laws and regulations. Id.

Despite the Division's findings, the CZM Committee found that the project would comply with territorial water quality standards. Transcript, CZM Committee, Dec. 4, 1986, at 96.[26] However, the Committee conditioned the permit on Sugar Bay obtaining and complying with all relevant federal and territorial water quality permits before starting to dredge the marina.[27] R. App. 192 (Permit No. CZX-98-86W ¶ 6(gg)).

Petitioner implies that a denial of the water quality certificate per se precludes the CZM Committee from finding that the project complies with territorial water quality standards. This is incorrect. Under V.I. Code Ann. tit. 12, § 911(c)(5), the CZM Committee, not the Division, is charged with finding that the project will meet water quality standards.

As an expert agency, the Division must receive the greatest deference. Nonetheless, the CZM Committee can still find compliance

---

[25] As Sugar Bay's own consultant noted, the major difference between the approach taken by the CZM Committee and that taken by the Division is that the Division wanted all plans and studies completed and approved before granting a water quality certification. Transcript, Board of Land Use Appeals, Aug. 2, 1987, at 25. The wisdom of the approach taken by the Division over that taken by the Committee is fully discussed earlier in this opinion. See § IV.A., supra.

[26] The Committee found that once Sugar Bay met the myriad conditions outlined supra, the project would comply with "the requirments for the occupancy of submerge[d] land" permits. See V.I. Code Ann. tit. 12, § 911(c). One of those requirements is "that there will be compliance with the Virgin Islands territorial air and water quality standards. Id. at § 911(c)(5).

[27] The CMZ Committee also attempted to address the Division's concerns by: (1) reserving the right to suspend dredging operations temporarily should potentially adverse environmental impacts or violations of the Water Quality Control Monitoring Plan occur; (2) requiring Sugar Bay to submit an Erosion Sediment Control Plan (ESCP); (3) requiring approval of the ESCP; (4) explicitly limiting dredging to previously dredged areas; (5) requiring Sugar Bay to submit a water quality control plan which would address the Division's additional requirements for water quality certification, and (6) requesting a complete analysis of the effects of dumping brine into the water. R. App. 190–93 (Permit No. CZX-98-86W ¶¶ 6(i), (o), (dd), (ee), (qq)).

208

with the territorial water quality laws despite adverse findings by the Division.[28] Thus, the proper inquiry is whether, if water quality certification is denied, substantial evidence nonetheless exists to support the CZM Committee's finding of compliance under V.I. Code Ann. tit. 12, § 911(c)(5).[29]

■ However, substantial evidence can only exist on a complete record. In this case, as the court discusses supra, the record was incomplete. Thus, on remand, once Sugar Bay completes the record by submitting the required plans and studies, the CZM Committee must reevaluate whether the project complies with territorial water quality standards. In performing this reevaluation, the CZM Committee must accord substantial deference to the findings of the Division.

The remaining issue before this court is whether the Board exceeded its authority when it ordered the Division to issue a water quality certification to Sugar Bay. The Board found that substantial evidence supported the CZM Committee's decision to issue the permits notwithstanding the absence of a water quality certificate. R. App. 207. The Board then went one step further and "ordered" the Division to issue a water quality certification. R. App. 209; see also Transcript, Board of Land Use Appeals, Aug. 2, 1987, at 5–58; Board of Land Use Appeals, Sept. 25, 1987, at 4–6.

At first blush, the Board's action seems unnecessary. Once it determined that substantial evidence existed to support the CZM Committee action, its inquiry could have, and should have, ended. In this case, however, the denial of the water certification took on greater practical significance. Under Section 404 of the Clean Water Act, Sugar Bay must obtain a permit from the Army Corps of Engineers to dredge the marina. 33 U.S.C. § 1344. In turn, approval by the Army Corps of Engineers is contingent on the Division certifying that the project complies with territorial water quality standards. See 33 U.S.C. § 1341. Under these overlapping statutory schemes, the lack of a water quality certification would effectively

---

[28] The Division's own report anticipates such a possibility. See R. App. 105 (Noting that dredging may be "permitted by the [CZM Committee] and the United States Army Corp of Engineers *despite* the denial of water quality certification) (emphasis added).

[29] As a practical matter, the court anticipates few circumstances in which countervailing evidence sufficient to outweigh a denial of water quality certification will exist.

void Sugar Bay's permit by preventing the dredging and construction of the marina. R. App. 266; Transcript, Board of Land Use Appeals, Aug. 2, 1987, at 25–29.

Describing this "catch-22" situation in a letter to the Board, Sugar Bay asked the Board to order the Division to issue a water quality certification. R. App. 265–67 (asking that the Board "mandate that the water quality certification be approved and issued by the" Division). Although the developer had not appealed,[30] the Board reviewed data originally contained in the Sugar Bay EAR, an excerpt of which was attached to the letter Sugar Bay submitted to the Board.[31] In its review, the Board not only found that the Division's findings were in error, but proceeded to order it to issue a water quality certification, ostensibly as a condition to the developer's permit.[32] R. App. 209 (Decision of Board of Land Use Ap-

---

[30] VICS appealed the Committee's finding that the project would comply with water quality standards notwithstanding the denial of the water quality certificate to the Board. At no time did Sugar Bay appeal the permits or any conditions attached thereto.

[31] This data allegedly underlies the Division's findings of noncompliance. However, testimony from the writer of the report, Marsha Gilnak-Taylor, indicates that the Sugar Bay data was not the sole basis for the Division's findings. See Transcript, Board of Land Use Appeals, July 22, 1987, at 20–21; see also Transcript, Board of Land Use Appeals, Aug. 2, 1987, at 17 (Vice Chairman of the Board questioning whether the denial was based on the figures alone). Apparently, the Division collected its own data, which according to Ms. Gilnak-Taylor was never provided to the CZM Committee. See Transcript, Board of Land Use Appeals, July 22, 1987, at 20–21.

[32] Condition Eight provides that:
> A Water Quality Report shall be issued by the Division of Environmental Protection Section of the Department of Planning and Natural Resources, contingent upon the submission and approval of a Monitoring Plan prepared by an independent consultant. During conctruction [sic], said consultant shall report directly to the Office of Coastal Zone Management.

R. App. 209.

The practical effect of this order is questionable. The Board conditioned certification on Sugar Bay submitting, and the CZM Committee and the Division approving, a monitoring plan. Transcript, Board of Land Use Appeals, Aug. 2, 1987, at 30. Under the terms of Condition Eight, if the Division rejects the plan, it need not certify the project. Moreover, if the Division were to refuse to certify the project, the Board has no apparent authority to enforce the order. Thus, certification was far from guaranteed.

Despite the dubious force of the Board directive, both parties have assumed that Condition Eight amounts to a Board-mandated certification of the project. See, e.g., Pet'r's Supp. Br. at 15, n.5. Accordingly, the court will briefly explore the issue on those terms.

peals (Dec. 17, 1987), condition 8); see also Transcript, Board of Land Use Appeals, Aug. 2, 1987, at 5–58.

Sugar Bay contends that the Board's action was entirely within its province. According to Sugar Bay, the VICZMA vests the CZM Committee and the Board with primary authority over regulation of the coastal zone. Sugar Bay relies heavily on Section 905, which directs all public agencies to cooperate with the CZM Committee in administering the VICZMA and to exercise their regulatory authority consistent with the VICZMA. V.I. Code Ann. tit. 12, § 905(j); see also 10 V.I. Op. A.G. at 42 (opining that the VICZMA mandates interagency cooperation).

Cooperation does not mean domination. The CZM Committee, relying on input from the Division, must determine whether the project will comply with applicable water quality standards. In turn, the Board must review the decision of the CZM Committee. Whether a water quality certification will issue, however, is a separate and distinct inquiry that simply does not involve the Board or the CZM Committee.

"The provisions of the [VICZMA] contemplate management or regulatory activities relating to the coastal zone . . . by departments and agencies [other] than the [DPNR]." 10 V.I. Op. A.G. at 41. For example, "Section 904(d) exempts from the jurisdiction of the [DPNR] those coastal zone management activities or programs carried out by any other agency at the time the [VICZMA] became effective, as well as any activities or programs which the Governor may assign to any other agency." Id. Furthermore, Section 905(f) of the VICZMA provides that

> except as otherwise specifically limited by territorial or federal law, [the VICZMA is not a limitation] on the power of any public agency to adopt and enforce additional regulations, not in conflict with this chapter [or to] impos[e] further conditions or restrictions on land or water uses or other activities which might adversely affect coastal zone resources.

Moreover, Section 905(i)(4) specifically prohibits the VICZMA from interfering with or limiting any territorial water quality and pollution laws.[33]

The court reads these provisions as prohibiting the Board from usurping the authority and duties accorded to the Division by its

---

[33] In addition, "Section 910(g) recognizes the jurisdiction of the United States Government over development and occupancy of the trust lands." 10 V.I. Op. A.G. at 41 (citing V.I. Code Ann. tit. 12, § 910(g)).

211

own governing statute. Of course, the CZM Committee and the Board are free to make the granting of the permit contingent on Sugar Bay obtaining certification. What they cannot do is attempt to control or influence the Division in its decision-making process.

Sugar Bay warns that this overlapping regulatory authority allows the Division to exercise veto power over the CZM Committee's exclusive permit granting authority. That is, as Sugar Bay colorfully puts it, the Division tail is improperly wagging the CZM Committee dog. Transcript, Oral Argument, Oct. 26, 1993, at 47.

Sugar Bay ignores the reality of development projects. Development projects require permits from assorted public agencies as a matter of course. The granting of a permit by one agency does not require the granting of permits by the others. Adopting Sugar Bay's view, the CZM Committee and the Board could order any governmental entity, from a recalcitrant planning commission to a "by the books" building inspector, to issue the relevant permits. To suggest that the legislature intended to vest such power in either the Board or the CZM Committee defies reason.

■ Accordingly, while the permit may be made contingent on the Division certifying the project, on remand neither the CZM Committee nor the Board may absolutely or conditionally require the Division to issue a water quality certification.

C. *"Area of Particular Concern" Designation*

The next issue before the court is whether the CZM Committee and the Board failed to recognize properly the Salt River estuary's status as an Area of Particular Concern under the VICZMA or to adhere to the CZM Commission's own management guidance for the area.

Enactment of the VICZMA was prompted by Congress' passage of the Coastal Zone Management Act (the "Federal CZMA"), which offers financial aid to states that develop Coastal Management Plans in conformance with the standards of the Federal CZMA. 16 U.S.C. § 1451, et seq. This grant-in-aid program is administered by the National Oceanic and Atmospheric Administration's ("NOAA") Office of Coastal Zone Management. NOAA makes grants to coastal states to develop management programs for the land and water resources of their coastal zone in order to receive approval by the Secretary of Commerce and remain eligible for future funding. 16 U.S.C. § 1454.

212

As a condition to receiving funding under the federal CZMA, the Virgin Islands government submitted a Final Environmental Impact Statement ("FEIS") in 1979, which set forth the proposed Coastal Zone Management Program for the Virgin Islands. See R. App. 51–67. In the FEIS, the Virgin Islands Planning Office designated 18 areas, including Salt River, as "areas of particular concern" ("APCs"). App. 57–60.

APCs are "areas in the coastal zone that require special and more detailed planning analysis and the preparation of special plans and implementation mechanism[s]." V.I. Code Ann. tit. 12, § 902(b). An area is designated as an APC based on its "coastal-related values or characteristics, or because [it] may face pressures which require detailed attention beyond the general planning and regulatory system which is part of the State's overall coastal program. This special management may include regulatory or permit requirements applicable only to the area of particular concern." 15 C.F.R. § 923.20(a).

In 1981, a CZM staff member, A.R. Teytaud, prepared a "final draft" of the Guidance Plan for the Salt River Bay Area of Particular Concern (the "Guidance Plan"). R. App. 68–104. The purpose of the Guidance Plan was to "provide a preliminary evaluation of the resources and issues in the Salt River APC . . . and to suggest some appropriate management responses" until a more detailed study could be undertaken.[34] R. App. 72.

Against this background, the CZM Committee refused to regard Salt River as an "official" APC based on Section 909 of the VICZMA, which provides that:

> The Commission may recommend, after reasonable notice and public hearings, designation of areas of particular concern within the . . . coastal zone and submit such recommendations to the Legislature for adoption. In recommending the designation of areas of particular concern, criteria for selection and implementing actions shall be included in a report prepared and adopted by the Commission.

V.I. Code Ann. tit. 12, § 909.

---

[34] Among the management responses suggested were that strict erosion control measures should be implemented, dredging should be restricted to the two partially developed sites, and a strict policy forbidding future damage to salt ponds or terrestrial wetlands should be adopted. R. App. 90–92.

213

Viewing Section 909 as the sole mechanism for designating APCs, the CZM Committee reasoned that because the Commission had neither finalized the Teytaud draft nor submitted it to the legislature for approval, Salt River did not meet the requirements for formal designation as an APC. Nevertheless, Salt River's "unofficial" status was not entirely disregarded during the application process. Sugar Bay purportedly treated Salt River as an APC in preparing its EAR. See R. App. 456–58. Furthermore, the Committee pledged to treat Salt River as an APC, and to use the existing Guidance Plan in evaluating Sugar Bay's application. See Permit No. CZX-97–86L, ¶ 6(c) ("The Salt River Basin is designated as an area of Particular Concern (APC) by the CZM Commission. [The Teytaud] report shall be used as a guideline for the development of this area.")

In its appeal to the Board, VICS claimed that the CZM Committee acted arbitrarily and capriciously by failing to analyze the Sugar Bay application in accordance with the Guidance Plan. The Board, finding the requirements of Section 909 unsatisfied, rejected VICS' claim and dismissed the Guidance Plan as "nothing more than a proposed implementation plan for Salt River." R. App. 199–201; see also Transcript, Board of Land Use Appeals, Aug. 2, 1987, at 57–96. The Board concluded that the CZM Committee was not obligated to analyze Sugar Bay's application in accordance with the Guidance Plan.

In its appeal to this court, VICS contends that the Board erred as a matter of law when it found first, that the designation of Salt River as an APC was without legal effect, and second, that the CZM Committee did not have to conform its review of Sugar Bay's application to the findings of the Guidance Plan.

The court's review of this issue is plenary. Bouton v. Government of the Virgin Islands, 28 V.I. 211, 218 (3d Cir. 1993). VICS contends that the FEIS served to designate officially Salt River as an APC. VICS further contends that Section 909 merely applies to designating future APCs, that is, APCs not already designated by the FEIS.

VICS relies on the Federal CZMA, which requires states as a prerequisite to program approval to inventory and designate "areas of particular concern within the coastal zone." 16 U.S.C. § 1454(b)(3); 15 C.F.R. § 923.21(b). In addition, states must provide in their management programs "for procedures by which areas of particular concern are designated." 16 U.S.C. § 1455(c)(9).

As further support, VICS relies on an excerpt from the FEIS, which after describing the process by which the 18 APCs were designated, noted that Section 909 of the VICZMA "provides a mechanism for future designation through adoption by the legislature." R. App. 57 (emphasis added).[35]

■ The interpretation and evidence offered by petitioner must be rejected.[36] Although extrinsic evidence contradicting the plain language of Section 909 exists, this court cannot disregard the plain meaning rule of statutory construction: where the statutory language is unambiguous, extrinsic evidence cannot be considered. Government of the Virgin Islands v. Knight, 989 F.2d 619, 633 (3d Cir.), cert. denied, 114 S.Ct. 556 (1993).

In essence, VICS is urging this court to turn the rules of statutory construction on their head, by looking first to extrinsic evidence, and then to the statutory language. Id. at 633 ("Statutory interpretation begins with the language itself.") A court may resort to extrinsic evidence only where facial ambiguity exists. Government of the Virgin Islands v. Santiago, 27 V.I. 232 (D.V.I. 1992); Island Periodicals, Inc. v. Olive, 26 V.I. 258 (D.V.I. 1991). A court may not use extrinsic evidence to inject ambiguity into a facially unambiguous statutory provision.

■ The language and meaning of Section 909 are clear—for an APC designation to have legal effect, the legislature must approve both the designation and the management guidelines. Moreover, petitioner's argument that Section 909 only applies to future desig-

---

[35] In its reply brief, VICS also cites to a report by NOAA, which similarly notes that Section 909 "provides that any new APC . . . may be designated by the Legislature upon recommendation" of the Commission. R. App. 717–18; R. App. 739. Because this report was neither before the CZM Committee nor the Board, it must be disregarded. See Haines v. Liggett Group Inc., 975 F.2d 81, 92–93 (3d Cir. 1992) (holding that a reviewing court is limited to the record before the initial tribunal).

Moreover, the probative value of both the NOAA report and FEIS excerpts is limited, because "[s]tatements from . . . nonofficial sources having no special connection with the preparation and proposal of a bill are not generally considered for interpretation purposes." United States v. Sorrell, 562 F.2d 227, 232 n.6c (3d Cir. 1977), cert. denied, 436 U.S. 949 (1978) (quoting Sutherland, Statutory Construction § 48.11, at 213 (4th ed.)).

[36] In researching this issue, the court discovered that the legislative history for section 909 was either lost or misplaced. This of course explains why neither party cited to the legislative history in support of their respective arguments.

nations of APCs fatally undercuts its position. Section 909 predated the FEIS submission to NOAA.[37] See R. App. 52 (Transmittal Letter dated March 19, 1979). Thus, any designation of APCs occurring after 1978 had to comply with the procedural requirements of Section 909. This court finds that the requirements of Section 909 were never met, and thus that the designation of Salt River Bay as an APC in the FEIS does not have legal force.[38]

Nor does the court find that the Committee is bound by the Teytaud draft Guidance Plan because without official APC designation by the legislature, it lacks legal basis. Moreover, it is no more than a draft; no governmental body has approved or adopted it. For these reasons, the draft Guidance Plan is non-binding.

One last issue presents itself. According to the testimony of Benjamin Nazzario, Director of the CZM staff, lack of funding was responsible for the delay in finalizing the Teytaud draft and implementing Section 909. Transcript, CZM Committee, Dec. 4, 1986, at 85–86.

To remedy the situation, the CZM Committee struck a Faustian bargain with Sugar Bay. As a condition to the permit, the Committee required Sugar Bay to finance the updating of the Teytaud draft by an independent consultant chosen jointly by Sugar Bay and the Committee, and to issue a supplement "indicating the impact of [its development] and incorporating the latest data available." Permit No. CZX-98–86L, ¶ 6(d); Permit No. CZX-98–86W, ¶ 6(d).

Sugar Bay obtained its permits and the Commission obtained its funding. Yet this deal came at a cost—the cost of grandfathering the Sugar Bay project from updated management guidelines. See Comments of Committee Member Ogden, CZM Committee, Dec. 4, 1986, at 84 ("[I]t seems a little strange. We're using a major development—one of the largest ever proposed for St. Croix to . . . en-

---

[37] The legislature enacted Section 909 on October 31, 1978, and it became effective on February 1, 1979. See V.I. Code Ann. tit. 12, §§ 909, 901 note (1982) (noting that the "Act Oct. 31, 1978, No. 4248, § 24, Sess. L. 1978, p. 317, provided 'The effective date of this Act (No. 4248) shall be February 1, 1979' "). The FEIS was not submitted until March 19, 1979.

[38] The court takes judicial notice of a bill, No. 20-0252, introduced on November 24, 1993 and signed into law on June 9, 1994, which designated Salt River and seventeen other areas as APCs pursuant to Section 909. According to newspaper accounts, threats by federal agencies to stop funding the CZM program finally prompted the Legislature to act on the Commission's recommendations. See The Virgin Islands Daily News, Nov. 4, 1993, at 4.

hance the APC; it's something like saying, you had to destroy this in order to save [it]."); see also Transcript, Board of Land Use Appeals, Aug. 2, 1987, at 83–84; 89–97 (discussing "grandfathering" effect of condition 6(dd)).

With respect to this issue, the court's hands are tied by the dictates of Section 909. Salt River is not an APC and the management guidelines are non-binding.[39] Yet condition 6(d) smacks of a quid pro quo exchange. Indeed, Condition 6(d) was viewed as such by the Committee. The record indicates that the Committee improperly considered the use of Sugar Bay for funding as a factor mitigating adverse ecological impacts. See Comments of Benjamin Nazario, Director of the Division of Coastal Zone Management, Transcript, CZM Committee, Dec. 4, 1986, at 85 ("Basically, what we're doing here is, if you deny the application, you do it on environmental reasons. If you approve it, you utilize [condition 6(d)] as a tool to, as a mitigating factor for things you cannot do. . . . [A]pprove [the application], utilizing this updating of the APC as a mitigating factor.")

Nowhere does the VICZMA allow the Committee to consider such a factor in weighing the competing concerns inherent in developing the coastal zone. Mitigation measures relate "to substantially lessen[ing] or eliminat[ing] any and all adverse environmental impacts of the development," not to whether Sugar Bay will cover revenue shortfalls for a public agency. V.I. Code Ann. tit. 12, § 910(a)(2). Accordingly, on remand the CZM Committee may not consider Sugar Bay's willingness to finance the updating of the APC as a mitigating factor.

D. *Can this Court's Action be Considered a Taking?*

Because this court is remanding the matter to the CZM Committee, the fourth and last issue of whether substantial evidence existed to support CZM Committee's decision need not be reached. However, Sugar Bay raises an issue which the court must consider, if only briefly.

Sugar Bay implies that anything short of this court affirming the actions of the CZM Committee and the Board will constitute a "taking" under the Fifth Amendment. Consideration of this contention is barred by the ripeness doctrine.

---

[39] Of course, the legislature could consider enacting legislation retroactively designating Salt River as an APC.

217

"Ripeness is 'peculiarly a question of timing.' " Taylor Inv. Ltd. v. Upper Darby Twp., 983 F.2d 1285, 1290 (3d Cir.), cert. denied, 114 S.Ct. 304 (1993) (quoting Thomas v. Union Carbide Agric. Prods. Co., 473 U.S. 568, 580 (1985)). "Its basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." Taylor Inv. Ltd., 983 F.2d at 1290 (citing Abbott Lab. v. Gardner, 387 U.S. 136, 148 (1967)).

■ For a claim in an as-applied challenge to a land use regulation to be considered ripe the claimant must establish two prerequisites. First, the property owner must show that he has obtained "a final and authoritative determination of the type and intensity of development legally permitted on the . . . property," that is, he must comply with the finality rule. McDonald, Sommer & Frates v. Yolo County, 477 U.S. 340, 348 (1986); see also United States v. Riverside Bayview Homes, Inc., 474 U.S. 121, 127 (1985) (holding that denial of a permit is a prerequisite to a regulatory taking). Second, the property owner must exhaust established procedures and just compensation must be denied. Williamson Planning Comm'n v. Hamilton Bank, 473 U.S. 172, 194–95 (1985).

■ No denial of the permit application has occurred. At this point in the proceedings, no one, not even this court, can predict "the type and intensity of development" that the CZM Committee will allow at Salt River. Accordingly, it would be premature for this court to decide Sugar Bay's takings argument.

## III. CONCLUSION

The CZM Committee and the Board are entrusted with safeguarding the Virgin Islands most prized commodity—its natural resources. Because the coastal zone and its environs are so precious, decisions affecting its use and development naturally provoke interest from many quarters. For some, the coastal zone represents economic opportunity for those without any; for others, it represents an opportunity to preserve the islands' ecological heritage. The presence of such varied concerns makes it all the more important that the agencies charged with protecting the coastal zone adhere to the highest standards of procedural integrity.

In this instance, although the agencies acted with good intentions, certain procedural shortcuts were taken. As this court's opinion demonstrates, such shortcuts undermine the effectiveness of the VICZMA in protecting coastal zone resources.

Accordingly, this court will vacate the decision of the CZM Committee and its affirmance by the Board, and remand the matter to the CZM Committee for further proceedings consistent with this opinion.

## ORDER ON WRIT OF REVIEW

This matter having come before the Court on the petition for writ of review of petitioner Virgin Islands Conservation Society, Inc.;

Having considered the submissions of the parties;

For the reasons set forth in the Court's opinion of this date;

IT IS on this 13th day of June, 1994 hereby ORDERED that

(1) the decisions of the Coastal Zone Management Committee and the Board of Land Use Appeals are vacated; and

(2) this matter is remanded to the Coastal Zone Management Committee for further proceedings in accordance with the Court's opinion of this date.