**Alson LOCKHART, Sr., Plaintiff,**

v.

**Mavis L. MATTHEW, M.D., Herbert Sanders, M.D., and Government of the Virgin Islands, Defendants.**

**Civil Action No. 2000–0129.**

District Court, Virgin Islands, D. St. Thomas and St. John.

May 30, 2002.

Alan D. Smith, Esquire, Hodge & Francois, St. Thomas, VI, Attorney for Plaintiff.

Denise George-Counts, Esquire, Assistant Attorney General, Department of Justice, St. Thomas, VI, Attorney for Defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

STANLEY S. BROTMAN, District Judge (Sitting by Designation).

### I. *INTRODUCTION*

Presently before the Court is Alson Lockhart, Sr.'s ("Lockhart") action against Defendants Mavis L. Matthew, M.D., Herbert Sanders, M.D., and the Government of the Virgin Islands (hereinafter collectively referred to as "Defendants"). The Court previously entered an Opinion in this matter which denied Defendants' Motion to Dismiss and Plaintiff's Motion for both Summary Judgment and a Mandatory Injunction, and further granted Plaintiff's Motion to file a Fourth Amended Complaint. *See Lockhart v. Matthew, et al.,* Civ. No.20 00–129 (D.V.I. filed Sept. 21, 2001) (the "September 2001 Opinion").

In the September 2001 Opinion, the Court concluded that there was a genuine issue of fact regarding Lockhart's ability to meet the 100 pound lift and carry requirement, a prerequisite to obtain a license as an Emergency Medical Technician in the Virgin Islands, set forth in Virgin Islands Executive Order No. 233–1979. This matter came on for trial, the Court sitting without a jury, on February 19th, 20th, and 26th, 2002, wherein the Court heard the testimony of witnesses, examined documentary evidence introduced by the parties, and considered the arguments of counsel.

On April 18, 2002, during the time period that the Court was awaiting counsels' post-trial submissions, Defendants filed a Renewed Motion to Dismiss pursuant to Fed.R.Civ.P. 12(h)(3). Defendants contend that Plaintiff's claim for injunctive relief became moot and that the Court now lacked subject matter jurisdiction. By Order dated April 18, 2002, the Court reserved judgment on Defendants' Motion and directed the parties to submit their Proposed Findings of Fact and Conclusions of Law, as previously ordered by the Court. (*See* Docket Entry at Line 116, Order dated Apr. 18, 2002).

After a careful review of the record, the Court enters the following Findings of Fact and Conclusions of Law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

### II. *FINDINGS OF FACT*

### A. *EMT Licensure in the Virgin Islands*

1. In order to work as an Emergency Medical Technician ("EMT") in the

Virgin Islands, it is necessary to first obtain a license. A Virgin Islands EMT license is valid for a period of two years. (Def.Ex. I). Persons may apply for a new license every two years, and must fulfill the requirements for a license each time in order to obtain a license. (Trial Tr., Vol I, at 131–32) (Test. of Dr. Herbert Sanders, M.D.) ("Dr. Sanders").

2. Executive Order 233–1979 (the "Executive Order") was created to establish legal requirements in the Virgin Islands for the licensure of EMTs. (Pl.Ex.1, Def.Ex.I). The Executive Order authorizes the Commissioner of the Virgin Islands Department of Health ("Department") to license EMTs, has the force and effect of law, and is the sole legal authority governing the issuance of EMT licenses in the Virgin Islands. (*Id.*); (Trial Tr., Vol. I, at 17–18) (Test. of Dr. Sanders,).

3. The Executive Order sets forth six specific criteria that an applicant must fulfill in order to obtain an EMT license. It provides, in relevant part, that:

*Section 2.* (a) A Virgin Islands Emergency Medical Technician license will be granted only to only those applicants who have fulfilled the following requirements:

1. Applicant must be nationally registered.

2. Applicant must have completed an approved four-year high school course of study or the equivalent thereof.

3. *Applicant must be able to lift and carry 100 lbs.*

4. Applicant must have a valid Virgin Islands' driver's license.

5. Applicant must have successfully completed the Emergency Defensive and Evasive driving course.

6. Applicant must submit written evidence, verified by oath, of good character and good physical and mental health.

*Section 2 (b)* Any person employed as an Emergency Medical Technician by the Department of Health on November 1, 1976, or subsequently, shall be considered licensed as of the date of national registration certification upon presenting proof of successful completion of the National Registry Examination.

V.I. Exec. Order 233–1979 (emphasis added); (Pl.Ex.1, Def.Ex.I).

4. National registry certification is only one of the prerequisites to obtain a Virgin Islands EMT license. (Def.Ex.I). An applicant for an EMT license must satisfy each requirement of the Executive Order.

5. The "lift and carry" requirement prescribed by the Executive Order is consistent with the standards established by the United States Department of Transportation in the National Standard Curriculum for EMTs, which states that an EMT "lifts stretcher, (be able to lift and carry 125 pounds) placing in ambulance and seeing that the patient and stretcher are secured, continues medical care." (Def.Ex.M).

6. The policy manual for EMS, and the Virgin Islands job description for EMTs specifically reference the Executive Order including the lifting requirement contained therein. (Def.Ex.K, J); (Trial Tr., Vol I, at 80–81) (Test. of Dr. Sanders).

7. In the Virgin Islands, it is extremely important that an EMT be able to lift and carry 100 pounds without re-

strictions. As stated in the proceedings:

It's critically important, particularly here in the islands because of the terrain. Frequently the ambulance does not have close access to where the patient is located. Many of the people that we pick up live in multi-story dwellings, some of the individuals are picked up on the beach, other places that the ambulance has to be parked at a considerable distance from where the patient is located. So the EMTs have to be able to carry the individuals not only long distances on occasion on flat ground, but also to bring individuals downstairs. Additionally, here in the Virgin Islands a number of the individuals that we pick up are—have a—are in excess of let's say 200 pounds so it's important that a minimum they be able to—the individual EMT be able to lift a hundred pounds.

(Trial Tr., Vol I, at 78–79) (Test. of Dr. Sanders).

8. Because the ability to lift 100 pounds is an important factor in the qualifications for an EMT license (*Id.* at 78), hiring EMTs who cannot lift and carry a 100 pounds would pose a serious danger to patients and compromise the effectiveness of emergency services to the public. Even lifting with back pain or risk of injury would compromise an EMT's performance, thus risking additional injury to patients. (Trial Tr., Vol. III, at 162–63) (Test. of Dr. Sanders). An EMT's ability to lift and carry 100 pounds without restrictions is therefore essential to ensure the safety and well being of patients, particularly in emergency situations. (*Id.*).

9. To apply for an EMT license, one must complete an EMT Licensure Application form, which contains, *inter alia*, the question, "Can you lift and carry a minimum of 100 lbs?" Immediately next to this question are blanks for an applicant to answer "Yes" or "No." (Def.Ex.P).

10. An applicant who checks "Yes" is deemed by the Department to have satisfied the lifting requirement so long as there is no information to contradict this affirmative statement. (Trial Tr., Vol I, at 19) (Test. of Dr. Sanders).

11. The applicant must also sign the application and make the following affirmation:

"I understand that my application will not be accepted for processing until it has been completed in its entirety and I hereby affirm and declare that the above information is true and correct and that any fraudulent entry may be considered a sufficient cause for rejection or subsequent revocation."

(Def.Ex.P).

## B. *Lockhart's Employment Background and Medical History*

12. Lockhart was employed by the Department, Division of Emergency Medical Services ("EMS"), and was licensed as an EMT. He first began to work for EMS as an EMT in 1980 (Trial Tr., Vol II, at 49) (Test. of Alson Lockhart, Sr.).

13. In 1989, Lockhart took a three month leave of absence. In 1991, he temporarily resigned his position for a period of 9 months, after which he returned to work until he suffered a back injury in June, 1992. He was out of work until September, 1992. Upon his return, he worked as a member of a two-person ambulance crew until March 1998, when he reinjured his back. He was placed on disability

leave for approximately two months, and returned to work in April or May 1998. Lockhart had advanced to the level of EMT Intermediate Cardiac Technician by 1998, but after his return, worked as a dispatcher while he recovered from his back injury. (Trial Tr., Vol. II, at 48, Vol. III, at 39, 79–80) (Test. of Alson Lockhart, Sr.).

14. The Department views the assignment of an EMT to the position of Dispatcher as a temporary assignment for EMTs suffering from a temporary disability. (Trial Tr., Vol. I, at 112) (Test. of Dr. Sanders).

15. During his recovery, Lockhart was under the care of his treating physician, Dr. James D. Nelson ("Dr. Nelson"), and he underwent physical therapy for his back injury. Lockhart first went to see Dr. Nelson regarding pain in his lower back on June 23, 1992. (Trial Tr., Vol III, at 87) (Test. of Dr. Nelson).

16. A review of Dr. Nelson's records regarding his treatment of Lockhart reveals the following information concerning Lockhart's medical history:

(a) Plaintiff suffers from a permanent partial disability. Since 1992, Dr. Nelson determined that Lockhart's back condition (bulging discs) was a permanent partial disability. (Def.Ex.B). Plaintiff had been suffering from low back and left leg pain as a result of his condition since 1986. (Def. Ex. A, at 13) (Test. of Dr. Nelson); (Def.Ex.B, Y).

(b) In 1992, based upon a CT scan, MRI, and EMG, Dr. Nelson diagnosed Lockhart with bulging discs as the cause of Lockhart's pain. (Def. Ex. A, at 15–16) (Test. of Dr. Nelson).

(c) Lockhart's back condition is both a permanent injury and a chronic degenerative condition expected to worsen with age. (Def. Ex. A, at 20) (Test. of Dr. Nelson); (Trial Tr., Vol. III, at 106, 108) (Test. of Dr. Nelson).

(d) In 1993, Dr. Elroy Francis made the following prognosis regarding condition of Lockhart's back:

"Based on the chronicity of the patients condition, the mechanism of injury, the examination results and the fact that the patient continues to aggravate his condition by way of his job responsibilities, the patients prognosis is poor."

(Def.Ex.X); (Trial Tr., Vol. I, at 141) (Test. of Dr. Sanders).

(e) A 1998 CT scan revealed degenerative changes in Lockhart's lumbar spine in the area of his bulging discs. (Def.Ex.Z); (Trial Tr., Vol. I, at 142); (Test. of Dr. Sanders).

(f) On March 15, 1999, Dr. Nelson, who had been Lockhart's treating physician since 1992, performed a neurological evaluation of Lockhart and reported that, "As a result of his injuries, this patient has sustained a permanent partial impairment. He is unable to lift. He is able to go on an ambulance as a third party." (Def.Ex. F) (*See infra* at ¶ 23) (Defining role and function of third party in three-person ambulance team).

17. Dr. Nelson's notes of Plaintiff's office visits between June 1998 and May 11, 2000, reveal that Plaintiff continually suffered from low back pain. (Def.Ex.AA–II, G).

C. *Lockhart's Application for Renewal of His EMT License*

18. In March, 2000, Lockhart's EMT license was up for renewal. On

March 30, 2000, he submitted an application to renew his Virgin Islands EMT license for the period covering April 1, 2000 through March 31, 2002. (Trial Tr., Vol. I, at 20) (Test. of Dr. Sanders); (Def.Ex.P).

19. Lockhart checked the answer "Yes" in response to the question, "Can you lift and carry 100 lbs?" Next to it, he made a handwritten parenthetical notation which stated "see attached disability status." (Trial Tr., Vol I, at 26, 83); (Def.Ex.P).

20. Lockhart attached to his application a Disability Status Report ("DSR") dated September 13, 1999, from his physician Dr. Nelson. It stated, "The above named patient is presently under my medical care and is advised to return to work only as a third party on an ambulance, with no heavy lifting to exceed 90 lbs.—light duty only." (Def.Ex.P).

21. Despite Plaintiff's checked answer of "Yes," asserting that he could lift and carry 100 pounds, Dr. Nelson's statement in the DSR expressly indicated that Lockhart was physically unable to meet the 100 pound lift and carry requirement of the Executive Order. (Trial Tr., Vol I, at 85) (Test. of Dr. Sanders).

22. The "Third Party" restriction stated in the DSR, as interpreted by the Department, imposes a lifting restriction on Lockhart. (*Id.* at 84–85); (Trial Tr., Vol. I, at 177–78) (Test. of Alexander Williams, EMS District Coordinator); (Def.Ex.N, PP). This restriction effectively relieved Lockhart from having any responsibility to lift patients, because the other two parties working on the ambulance would be re-

quired to perform the lifting and carrying of patients on a stretcher. (Trial Tr., Vol. I, at 84–85) (Test. of Dr. Sanders)

23. As his treating physician, Dr. Nelson advised Lockhart that although he thought Lockhart was able to lift 100 pounds, because of his history of having two bulging disks in the lumbar area, specifically L4–5 and L5 to S1, it was not in Lockhart's best interest to do so. He therefore recommended that Lockhart continue on the ambulance as a third party. (Trial Tr., Vol III, at 91–92) (Test. of Dr. Nelson).

24. In 1999 and 2000, Lockhart worked as a third party with several other EMTs, including Emmet Petersen (Petersen), Glen Bonelli (Bonelli), Calvin Howard (Howard), and Jorge Melendez (Melendez), and he performed the lifting and carrying of patients. (Trial Tr., Vol. I, at 188) (Test. of EMT Bonelli); (Trial Tr. Vol II, at 21–25) (Test. of EMT Petersen), 38–39 (Test. of EMT Howard), 44 (Test. of EMT Melendez).

25. Staffing ambulances with a third party is not an administratively feasible option because of severe shortages of available skilled personnel. (Trial Tr., Vol. I, at 112–15) (Test. of Dr. Sanders). Moreover, it is not administratively feasible for the Department to have a full time dispatcher position because that position is used by EMTs who are injured and recovering from temporary short-term disabilities. (*Id.* at 116–18).

D. *The Review Process for Lockhart's Application*

26. Defendant Herbert Sanders ("Dr. Sanders") is the Director of Emergen-

cy Services at the Virgin Islands Department of Health. He is responsible for overall management of EMS including the review of EMT applications and the recommendation of EMT licensure to the Commissioner of Health. The Commissioner of Health is the approving authority for the issuance of EMT licenses and makes the final decision on the issuance of EMT licenses. (Trial Tr., Vol I, at 111–12, 160–61) (Test. of Dr. Sanders).

27. When Dr. Sanders reviewed Plaintiff's application and found the DSR attached to Lockhart's application, he noticed a contradiction and was doubtful of Lockhart's ability to comply with the 100 pound lift and carry requirement set forth in the Executive Order. (*Id.* at 24, 46, 85).

28. Dr. Sanders consulted Lockhart's personnel file to obtain more information regarding Lockhart's ability to satisfy the lift and carry requirement. (*Id.* at 29). He did not meet with Lockhart individually to discuss his application. (*Id.* at 45). As a basis of authority, he relied on the Executive Order for the criteria and qualifications required for issuance of Virgin Islands EMT licenses. (*Id.* at 17).

29. In his review of Lockhart's personnel file, Dr. Sanders observed and reviewed the following documents:

(a) July 27, 1998 DSR from Dr. Nelson stating, "The above named patient may return to work with light duty restriction. He will be unable to lift anything over 20 pounds." (Def.Ex. C); (Trial Tr., Vol. I, at 89) (Test. of Dr. Sanders).

(b) August 27, 1998 DSR from Dr. Nelson stating, "The above patient may continue to work with light duty restriction as dispatcher. Should not be allowed to lift anything over 20 pounds until next appointment." (Def.Ex.QQ); (Trial Tr., Vol. I, at 91) (Test. of Dr. Sanders).

(c) March 4, 1999 DSR from Dr. Nelson stating, "The above named patient may continue to work as light duty status. He may also go on ambulance as a third party but no lifting." (Def.Ex.D); (Trial Tr., Vol. I, at 90) (Test. of Dr. Sanders).

(d) March 30, 1999 letter to Lockhart from EMS District Coordinator Alexander Williams stating, "Due to your disability status, the department would like to utilize you as a third party on the ambulance as needed .... Lifting will not be required of you." (Def.Ex.PP); (Trial Tr., Vol I, at 93) (Test. of Dr. Sanders).

(e) July 16, 1999 letter to Lockhart from EMS District Coordinator Alexander Williams stating,

Based on your Disability Status, letter dated 3/4/99, it is imperative that you have your physician reevaluate your status at this time. The department has been utilizing you as a third party on ambulance calls during your tour as dispatcher as stated in the memorandum of March 30, 1999. The department would not like to place you in a position whereby further aggravation of your injury is sustained.

(Def.Ex.O).

(f) September 13, 1999 copy of DSR signed by Dr. Nelson stating "The above named patient is presently under my medical care and is advised to return to work only as a third party on an ambulance, with no heavy lifting to exceed 90 lbs.— light duty only." (Def.Ex.P); (Trial

Tr., Vol I, at 91) (Test. of Dr. Sanders).

30. Based on Lockhart's application, the attached copy of a DSR dated September 13, 1999, memoranda, and, specifically, the other DSRs contained in Lockhart's personnel file indicating a history of disability, Defendants reasonably concluded that Lockhart failed to meet the 100 pound lift and carry requirement prescribed by the Executive Order. He therefore did not fulfill the requirements necessary to obtain an EMT license. (Trial Tr., Vol. I, at 85, 89–94) (Test. of Dr. Sanders); (Trial Tr., Vol III, at 112) (Test. of Dr. Nelson).

31. On April 4, 2000, Dr. Sanders issued a memorandum to Lockhart denying his application for an EMT license. This memorandum states in relevant part:

Your application for an EMT license is denied based on Executive Order 233–1979, Section Two, Article Three, which states: "Applicants must be able to lift 100 lbs." On your application you answered "yes, see attached disability status" in reference to the above. The attachment indicates, "you can return to work only as a third party on the ambulance, with no heavy lifting to exceed 90 lbs.—light duty only." Your disability restriction has been on-going since March 27, 1998. Your application indicates you are not presently eligible for license renewal.

(Def.Ex.Q).

32. Defendants granted Lockhart a thirty-day extension of his current EMT license, through April 30, 2000, to give him "an opportunity to meet the requirements of the order." Dr. Sander's memorandum was signed and approved by Wilbur K. Callender, MD, FACOG, the Commissioner of Health for the Department. (Id.); (Trial Tr., Vol I, at 86) (Test. of Dr. Sanders).

33. At this time, Lockhart could have obtained his license once he provided Defendants with an unequivocal statement from his physician that Lockhart was able to lift and carry 100 pounds within the meaning of the Executive Order. (Id. at 46). During this period, however, Lockhart did not provide Defendants with any additional information from his physician to verify his ability to meet the 100 pound lift and carry requirement. (Id. at 86).

34. Defendants granted Lockhart another extension until May 12, 2000. (Def.Ex.R) (Trial Tr., Vol I, at 95) (Test. of Dr. Sanders). Lockhart did not provide Defendants any further information to establish that he met the lift and carry requirement. (Trial Tr., Vol I, at 96) (Test. of Dr. Sanders).

35. On May 15, 2000, Defendants granted Lockhart his last extension, extending the deadline until May 31, 2000 for him to comply with Defendants' request. (Def.Ex.S); (Trial Tr., Vol. I, at 95–97) (Test. of Dr. Sanders). Throughout this last period, Lockhart failed to provide Defendants with any statement from his physician that he could lift and carry 100 pounds. (Trial Tr., Vol. I, at 96–97) (Test. of Dr. Sanders).

36. Defendants provided EMTs Glenn Bonnelli and Jerome Knight, who were also on light-duty status with lifting restrictions, extensions on their licenses so they could provide additional information to meet the lifting requirement, just as Defendants did for Lockhart. Unlike Lockhart, however, both Bonnelli and Knight provid-

ed Defendants with unequivocal statements from their physicians that they could lift and carry a minimum of 100 pounds (statements contained some restriction on weights over 100 pounds) within the extension period granted by Defendants. Since Bonnelli and Knight provided information that they could lift and carry up to 100 pounds without any restrictions, Defendants issued them their EMT licenses. (Def.Ex.KK, LL, MM, NN); (Trial Tr., Vol. I, at 193–95, 199) (Test. of EMT Bonelli); (Trial Tr., Vol. II, at 12–17) (test. of EMT Knight).

37. EMT Emmet Petersen, also subject to a lifting restriction, provided Defendants with a definitive statement from his physician indicating that following a two–week rest period, he would be able to lift and carry 100 pounds. With the assurance of his ability to meet the lifting requirement without any restriction, Defendants issued Petersen his EMT license. (Trial Tr., Vol. II, at 321–25) (Test. of EMT Petersen).

38. On June 7, 2000, Lockhart filed a grievance regarding Defendants' denial of his license and subsequent removal from the work schedule.

(Def.Ex.T). He commenced this lawsuit on June 21, 2000.[1]

### E. *Lockhart's Financial Losses*

39. Lockhart's income as an EMT for 1999 was approximately $49,000.00. (Trial Tr., Vol. III, at 24) (Test. of Alson Lockhart, Sr.).

40. Lockhart's base employment salary was $36,926.00 in 1999 and 2000. Effective September 23, 2001, his base salary scale was increased to $46,185.00. (Trial Tr., Vol. III, at 26) (Test. of Alson Lockhart, Sr.); (Pl.Ex.20).

41. Lockhart earned approximately $32,000 during year 2000, including income earned from the Department for the months that he remained on the work schedule, and work he performed subsequent to his removal from the work schedule. (Trial Tr., Vol. III, at 24–25).

42. As a result of his removal from the EMS work schedule, his payroll deductions ceased.

### III. *CONCLUSIONS OF LAW*

### A. *Jurisdiction*

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C.

---

1. The Court's review of Defendants' denial of Lockhart's EMT license focuses on Defendants' April 4, 2000 decision, the date of the original disapproval, and further incorporates the time period up until May 31, 2000, reflecting extensions granted to Lockhart to submit documentation confirming his ability to meet the lift and carry requirement of the Executive Order. On July 5, 2000, Lockhart ultimately presented Defendants with a statement from Dr. Nelson, his treating physician, that he could lift and carry 100 pounds. (Pl. Ex. 8). Although Lockhart eventually complied with Defendants' request, this letter is irrelevant to the Court's determination whether Defendants' April 4, 2000 decision was rationally based on substantial evidence.

Moreover, at trial, when asked during cross examination whether Lockhart should lift and carry, Dr. Nelson stated, "My feeling is that Lockhart has a back problem. He should avoid lifting as much as possible.... In other words, if he does lift too much he's going to have more back pain." (Trial Tr., Vol. III, at 131) (Test. of Dr. Nelson); *see also* (Trial Tr., Vol. III, at 131–38). The Court's decision is predicated on the events that occurred during this specific time period. This letter was produced during settlement negotiations and Lockhart provided it after he commenced this litigation. (Trial Tr., Vol. I, at 119–30) (Sidebar discussion between Court and Counsel for Plaintiff and Defendants).

§§ 1331, 1343, and 1367, and Section 22(a) of the Revised Organic Act of 1954, 48 U.S.C. §§ 1541–1645 (1995 & Supp.2001) because Plaintiff seeks relief from claims arising under the Fifth and Fourteenth Amendments to the United States Constitution, 42 U.S.C. § 1983, and Section 3 of the Revised Organic Act of the Virgin Islands, 48 U.S.C. § 1561.

## B. Standard of Review

■ 2. In reviewing an administrative decision, the Court must determine if the administrative body applied the appropriate standard. This determination turns on four issues:

(1) Whether the agency acted within the limits of its statutory powers;

(2) Whether the agency applied the relevant law correctly;

(3) Whether the agency findings are supported by substantial evidence on the record; and,

(4) Whether the agency has abused its discretion by acting in an arbitrary or capricious manner.

*V.I. Conservation Soc'y, Inc. v. V.I. Bd. of Land Use Appeals,* 857 F.Supp. 1112, 1117 (D.Vi.1994).

3. The judicial role in reviewing administrative decisions is very limited, however, and the Court will not second-guess the agency even if it would have arrived at a different result.[2] *Id.* at 1118 n. 11.

4. The analysis of the first two issues is even more circumscribed when the administrative agency's decision is pursuant to an Executive Order instead of a statute. In that case, the agency's interpretation of the order is invalid and subject to judicial review only if that interpretation goes beyond the scope of the order. *Contractors Ass'n of E. Pa. v. Sec'y of Labor,* 442 F.2d 159, 175 (3d Cir.1971) ("[C]ourts should give more than ordinary deference to an administrative agency's interpretation of an Executive Order or regulation which it is charged to administer.").

5. Regarding the third issue, substantial evidence has been defined as "evidence that a reasonable mind would accept as adequate to support an agency's conclusion." *Atl. Limousine,*

**2.** At the outset, the Court notes that because of the rational basis review standard, which is extremely deferential to Defendants, the Court is constrained from engaging in a more searching level of inquiry into the circumstances regarding Defendants' denial of Alson Lockhart's license. Simply put, the Court's hands are tied. The Virgin Islands Department of Health is charged with the important mission of protecting the lives of the citizens of the Virgin Islands. The Department has the duty to ensure that all EMTs are physically able to perform fully all of the essential duties and requirements of the position, including the safe lifting and carrying of patients. Regarding the 100 pound lift and carry affirmation, the Court is rather skeptical that a simple affirmation by the applicant is itself sufficient to demonstrate the competence to perform such a critical and essential

job function. Were the Court to test Defendants' premise, and focus on the EMT license application and approval process through a lens of intermediate scrutiny, it might find that this process would not withstand such an inquiry. The Court believes that the Virgin Islands Department of Health, EMS, has the duty to evaluate an EMT's physical capabilities in an objective and independent manner. EMTs play a critical role in our society by helping to save lives on a daily basis. Therefore, it is the Court's view that beyond a simple affirmation contained in the license application, the Department should design and implement a cost-effective mechanism to ascertain an applicant's ability to meet the lift and carry requirement. This will not only protect the safety of the public when they require emergency medical services, but will protect the safety of the EMT as well.

*Inc. v. NLRB,* 243 F.3d 711, 718 (3d Cir.2001) (defining the term in accordance with the National Labor Relations Act).

6. Regarding whether the agency has acted in an arbitrary or capricious manner, the Court must consider whether the agency has relied on factors extraneous to those contemplated in the order on which it made its decision, "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983), (quoted in *Rite Aid of Pa., Inc. v. Houstoun,* 171 F.3d 842, 853 (3d Cir.1999)).

**C. *Defendants' Denial of Lockhart's Application for a Renewed EMT License***

■ 7. Defendants acted properly in interpreting the requirements of Executive Order 233–1979. Their decision to deny Lockhart's application for renewal of his EMT license on the ground that he could not meet the 100 pound lifting requirement was rationally based on substantial record evidence before them.

8. The documentary evidence contained in Lockhart's file at the time that his license was denied on April 4, 2000 was both substantial and adequate to support Defendants' conclusion that his disability restriction rendered him ineligible for license renewal, given the conflicting information contained in his EMT application and attached DSR, as well as the contents of his personnel file.

9. The DSRs and memoranda showed that at least since March 1998, Lockhart was unable to lift and carry 100 pounds and had been working as a dispatcher or as a third party on an ambulance because he was unable to lift.

10. Because no document other than the September 1999 DSR was included along with Lockhart's application, Defendants acted reasonably in relying on the substantial likelihood that Lockhart's lifting disability and its applicable restrictions remained in effect. There were no other reports in his personnel file or on record to mitigate against or otherwise contradict the substantial evidence and indicia demonstrating Lockhart's disability.

11. The purpose of the Executive Order is to provide the legal requirements for EMT licensure, and the lifting requirement is an integral part of the EMT position because an EMT must be able to lift patients. Defendants are required to formally comply with the requirements of the Executive Order. Defendants, charged with protecting the public interest, therefore had a legal obligation to deny the renewal of Lockhart's license for his failure to meet this important legally prescribed requirement. They therefore properly construed the intent underlying the 100 pound lift and carry requirement.

**D. *Lockhart's Equal Protection Claim***

■ 12. Lockhart has failed to demonstrate that Defendants treated him

differently than other similarly situated EMTs. "Unless a statute creates a suspect classification or impinges upon a fundamental interest, it will be upheld if the purpose of the classification bears some rational relationship to a legitimate state interest." *United States v. Hawkins*, 811 F.2d 210, 216 (3d Cir.1987). A classification is only found irrational when it "rests on grounds wholly irrelevant to the achievement of the State's objective." *Id.* To state a cause of action under the Equal Protection Clause of the Fourteenth Amendment, a plaintiff must identify a classification that either exists on the face of the challenged statute or discriminatory results from its application. *Washington v. Davis*, 426 U.S. 229, 241, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). When the challenged statute is facially valid, as it is in this case, Plaintiff must also establish that "the legislature had a discriminatory intent." *Bell v. United States*, 754 F.2d 490, 495 (3d Cir.1985).

13. The requirement that an EMT applicant must be able to lift and carry 100 pounds is facially neutral and does not evince a discriminatory intent. This requirement clearly bears a rational relationship to the legitimate interest of protecting the public interest by ensuring that EMTs are physically able to perform the functions of the job.

14. Lockhart has not established discrimination because he is not similarly situated with respect to EMTs Glenn Bonelli and Jerome Knight. Unlike Lockhart, Bonelli and Knight, during the extension periods granted to them, provided unequivocal statements from physicians that they could lift and carry a minimum of 100 pounds. Because they could lift and carry up to 100 pounds without any restrictions, the Department properly issued them EMT licenses. EMT Emmet Petersen also provided a statement that he could meet the lifting requirements without restriction.

15. Lockhart has not presented evidence of another EMT applicant with a similar medical history or record that was granted a license. His equal protection claim is therefore without merit.

E. *Lockhart's Claim for Violation of Due Process and Civil Rights under 42 U.S.C. § 1983*

16. Lockhart has not been deprived of a constitutional right because he does not have a property interest in his license.

17. EMT licensure is a state-created entitlement. The Executive Order specifically restricts the entitlement of licensure to persons who meet its specified requirements.

18. To have a property interest in any government benefit, a person must have more than an abstract need or desire for it; he must have a legitimate claim of entitlement. *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). But, "to have a property interest in a [state] benefit," however, one "must have more than an abstract need or desire for it. [One] must have more than a unilateral expectation of it. [One] must, instead, have a legitimate claim of entitlement to it." *Id.* A legitimate claim

of entitlement cannot be premised on the Constitution itself, but must be derived from some independent source in either state or federal law. *Id.*

19. Lockhart's property interest cannot vest unless and until he meets all of the prerequisites of the Executive Order and a license is issued. EMT licenses, once issued, expire after a two year period along with the property interest therein. Any property interest that Lockhart may have had in his previously held license expired upon the expiration of the license. *See, e.g., Conrad v. County of Onondaga Examining Bd. for Plumbers,* 758 F.Supp. 824 (N.D.N.Y.1991) (holding a journeyman-plumber had no constitutionally protected claim of entitlement to obtain a master plumber's license; although the journeyman-plumber had a property interest in taking the examination, he did not have a property right to the grant of the license upon failing the examination).

20. Moreover, Defendants' decision to deny Lockhart's EMT license was rationally based on substantial evidence. *See Midnight Sessions, Ltd. v. City of Philadelphia,* 945 F.2d 667 (3d Cir.1991) (denial of dancing hall license for legitimate government reasons not taking of property or due process violation).

**F.** ***Lockhart's Claim for Compensatory Damages***

21. Lockhart is not entitled to receive compensatory damages under 42 U.S.C. § 1983 because he sued Defendants only in their official capacities, and monetary damages are therefore not an available remedy. Suits of private parties seeking to impose a liability which must be met by public funds of the state treasury are barred by the Eleventh Amendment. *Edelman v. Jordan,* 415 U.S. 651, 662–63, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Fitchik v. New Jersey Transit Rail Operations, Inc.,* 873 F.2d 655, 659 (3d Cir.1989).

22. For the purposes of section 1983, territorial officials sued in their official capacities are not "persons" with respect to suits for retrospective damages, *Brow v.Farrelly,* 994 F.2d 1027, 1037 n. 11 (3d Cir.1993), but are "persons" with respect to suits for prospective injunctive relief, *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71 n. 10, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989); *Ex parte Young,* 209 U.S. 123, 159–60, 28 S.Ct. 441, 52 L.Ed. 714 (1908). *See also Everett v. Schneider,* 989 F.Supp. 720 (D.Vi. 1997) (Plaintiffs suing territorial officials under section 1983 only in their official capacities could maintain claim for injunctive relief, but monetary damages were not available).

23. Because Defendants' denial of Lockhart's EMT license for the period April 1, 2000 through March 31, 2002 was rationally based on substantial evidence, the Court cannot grant prospective injunctive relief to Lockhart by granting him an EMT license for the period covering April 1, 2002 through March 31, 2004.

## IV. CONCLUSION

For the reasons stated above, the Court enters judgment in favor of Defendants on all of the claims contained within Lock-

hart's Complaint[3] An appropriate Order will be entered.

## ORDER

**THIS MATTER** having come before this Court on Plaintiff Alson Lockhart Sr.'s claim against Defendants Mavis L. Matthew, M.D., Herbert Sanders, M.D., and the Government of the Virgin Islands (collectively "Defendants");

The Court having conducted a bench trial on this matter on February 19th, 20th, and 26th, 2002; and, in accordance with the Findings of Fact and Conclusions of Law determined this date, and pursuant to Rule 58 of the Federal Rules of Civil Procedure;

**IT IS** on this 30th day of May 2002;

**ORDERED** that final judgment is hereby entered in favor of Defendants and against Plaintiff Alson Lockhart, Sr.; and

**IT IS FURTHER ORDERED** that Defendants' Renewed Motion to Dismiss filed pursuant to Fed.R.Civ.P. 12(h)(3) is hereby **DISMISSED AS MOOT.**

---

**3.** Throughout the proceedings, Lockhart's skills and qualifications as an EMT were never in dispute. Defendants further acknowledged that Lockhart possesses advanced skills and a level of experience that are both valued and needed by the Department of Health, which suffers from severe staffing shortages. In the event that Lockhart's physical condition improve to the point where he would meet the physical requirements set forth in Executive Order 233–1979, Defendants likely would benefit from utilizing his skills and experience within the Department.