**AMERICAN SAMOA GOVERNMENT, Plaintiff/Respondent,**

**v.**

**DIANE MAJHOR, Defendant/Petitioner.**

---

**AMERICAN SAMOA GOVERNMENT, Plaintiff/Respondent,**

**v.**

**SELINA ROPATI, Defendant/Petitioner.**

High Court of American Samoa
Trial Division

CR No. 15-03
CR No. 20-03
CR No. 27-02

January 18, 2005

Before RICHMOND, Associate Justice, MAMEA, Associate Judge, and TAPOPO, Associate Judge.

Counsel: For Petitioner Dianne Majhor, Paul F. Miller
For Petitioner Selina Ropati, Andrew Stave, Assistant Public Defender
For Respondent, Diane Roy, Assistant Attorney General

## ORDER DENYING IN PART AND GRANTING IN PART PETITIONS FOR HABEAS CORPUS

### Introduction

Petitioner Diane Majhor ("Majhor"), a pretrial detainee, on December 6, 2004, and Petitioner Selina Ropati ("Ropati"), a convicted prisoner (together "Petitioners"), on December 7, 2004, petitioned for writs of habeas corpus. The petitions were consolidated for order to show cause hearings taking place on December 9, 15, and 23, 2004. Both petitions challenged Petitioners' conditions of confinement and denial of privileges after having been transferred from the general female prison population to the "Bravo Unit" of the Tafuna Correctional Facility ("TCF") on October 23, 2004 for alleged violations of TCF rules and regulations. No disciplinary hearings occurred prior to the transfers.

On December 7, 2004, after this Court issued an order to show cause on Majhor's petition, the Commissioner of Public Safety ordered Petitioners to be removed and returned to the general female population. On December 8, 2004, TCF officials boarded the windows in Petitioners' new cell for the stated purpose of protecting other prisoners from Ropati's alleged lewd conduct. Petitioners maintain that the boarding constitutes continued punishment and retaliation for their petitions, and that the heat and lack of ventilation caused by the boarding of the windows has produced oppressive and uninhabitable cell conditions.

After reviewing the parties' submissions and analyzing the relevant authorities, we conclude that the transfer to Bravo Unit failed to implicate the constitutional due process rights of either petitioner, but that the TCF must either remove the boards from the cell windows or provide adequate alternatives to reduce the heat in Petitioners' present living conditions.

Discussion

## I. Jurisdiction

Although the law is not clearly established as to whether a habeas petition is the proper vehicle for the matter currently before this court, for lack of prior clarity on this issue we will allow it for the current case. In *Bell v. Wolfish* the Supreme Court expressly stated, "we leave to another day the question of the propriety of using a writ of habeas corpus to obtain review of the conditions of confinement, as distinct from the fact or length of the confinement itself." 441 U.S. 520, 526 n. 6 (1979); *see also Preiser v. Rodriguez*, 411 U.S. 475, 489-99 (1973) (where the court distinguished between the remedy of habeas corpus, appropriate for state prisoners challenging the underlying conviction and sentence on federal constitutional grounds, and a 42 U.S.C § 1983 civil rights remedy for a state prisoner who is making a constitutional challenge to the conditions of his prison life, but declined to lay a boundary between the two).

Since these holdings, the federal circuit courts have split on what kind of issues may be raised in a habeas petition, with some circuits concluding that a habeas petition may challenge the conditions of confinement while others determining that it may not. *See Boudin v. Thomas*, 732 F.2d 1107, 1111 (2d Cir. 1984) (habeas is the appropriate action to challenge conditions of confinement where the prisoner seeks to be moved in order to remedy past constitutional violations); *Streeter v. Hopper*, 618 F.2d 1178, 1181 (5th Cir. 1980) (habeas jurisdiction allowed where petitioner challenged administrative segregation without due process); *but see Crawford v. Bell*, 599 F.2d 890, 891-92 (9th Cir. 1979) (the writ of habeas corpus is limited to attacks on either the legality or the duration of confinement).

 Our own precedent has not clearly resolved this question. In *Am. Samoa Gov't v. Agasiva*, we stated that "[t]he court is mindful that habeas corpus is not available to the judiciary to review prison management and the nature and condition of a prisoner's otherwise lawful confinement." 6 A.S.R.2d 32, 38 (Trial Div. 1987). The court continued, however, observing that "habeas corpus is appropriate to review unconstitutional actions of prison officials and may be available in 'exceptional circumstances rising to the level of constitutional

deprivations.'" *Id.* We note that territorial officials sued in their official capacities under 42 U.S.C § 1983 are "persons" with respect to suits for prospective injunctive relief and that given the nature of the claim, a civil rights action would have been a more appropriate alternative avenue to pursue this matter. *Lockhart v. Matthew*, 203 F. Supp.2d 403, 415 (D. V.I. 2002). In light of *Agasiva*, however, we recognize that a habeas petition may be brought where the petitioner challenges the constitutionality of the conduct of prison officials.[1]

## II. Petitioners' Burden

Petitioners have the burden to show that a liberty interest has been implicated such that they were denied their right to a due process hearing prior to disciplinary action. As Majhor is a pretrial detainee not yet convicted of a crime, and Ropati is a convicted prisoner, the liberty interests possessed by each differs, and in turn, so does the burden of proof differ in establishing the violation of a liberty interest.

### A. Pretrial Detainees

In *Bell*, the Supreme Court held that because a detainee may not be subjected to punishment prior to an adjudication of guilt in accordance with due process rights, the standard for determining whether a pretrial detainee's claim implicates a constitutionally protected interest is "whether particular restrictions and conditions accompanying pretrial detention amount to punishment." *Bell*, 441 U.S. at 536-38. A particular restriction is not "punishment" in the constitutional sense if it is reasonably related to a legitimate governmental objective, as opposed to being arbitrary or purposeless. *Id.* at 539. If the conduct does not constitute "punishment," it will not be deemed to have impaired a detainee's liberty interest, and thus may be undertaken without a due process hearing. *See McMillian v. Cortland County Correctional Facility*, 198 F.3d 234 (2d Cir. 1999). Under *Bell*, then, to trigger due process rights, the burden is on the petitioner to show that the state intended to punish, or to show that the challenged conduct is not reasonably related to a legitimate goal. *Id.* at 538-39 (court may infer act is punishment if the petitioner can show it was arbitrary or purposeless); *Block v. Rutherford*, 468 U.S. 576, 584, (1984); *see Fuentes v. Wagner*, 206 F.3d 335, 342 (3d Cir. 2000) (court looked to see if petitioner "clearly established" government intent to punish). On the other hand, if

---

[1] We point out that before commencing a § 1983 action, a prisoner must first exhaust his or her administrative remedies, pursuant to the 1996 Prison Litigation Reform Act, 42 U.S.C. § 1997e(a). In *Porter v. Nussle*, 534 U.S. 516, 524 (2002), the Supreme Court made exhaustion mandatory.

the petitioner cannot provide substantial evidence of an express intent to punish, courts should ordinarily defer to the expert judgment of correctional officials as to whether the restriction is reasonably related to a legitimate governmental goal. *Bell*, 441 U.S. at 540 n. 23; *see also Kennedy v. Mendoza-Martinez*, 372 U.S. 144 (1963).

 In *Collazo-Leon v. U.S. Bureau of Prisons*, petitioner, a pretrial detainee, petitioned for a writ of habeas corpus maintaining that a 90-day disciplinary segregation and six-month revocation of telephone and visitation privileges amounted to "punishment" within the meaning of *Bell* when it was imposed upon him as a prison disciplinary measure for violation of prison rules in attempting to bribe a prison guard and attempting to escape. 51 F.3d 315 (1st Cir. 1995). The court, however, disagreed. The court reasoned that although *Bell* prohibits punishment of a pretrial detainee when given as a sanction for unproven criminal conduct, "reasonable punishment may be imposed to *enforce* reasonable disciplinary requirements." *Id.* at 318 (emphasis in original). Noting that under *Bell*, that a legitimate government objective includes "maintaining safety, internal order, and security within the institution," the court determined that even though the disciplinary action may be viewed as having a punitive effect, it served the legitimate purpose of facilitating order by deterring the detainee from violating prison rules in the future. *Id.* at 318 (citing *Bell*, 441 U.S. at 540). The court observed that were it to adopt the view that all prison disciplinary actions are impermissibly punitive, when taken to its extreme, a detainee could never be subject to discipline for violating prison rules, and thus would have no incentive to abide by them. Thus the court concluded, "[t]he administrators of the prison must be free, within appropriate limits, to sanction the prison's pretrial detainees for infractions of reasonable prison regulations that address concerns of safety and security within the detention environment." *Id.* at 318.

Accepting this distinction between impermissible punishment for the underlying unproven crime and permissible punishment for prison infractions, we similarly conclude that Majhor has not shown that the confinement in the Bravo Unit is "punishment" in the *Bell* sense, and has not, in turn, met her burden in showing that the transfer to Bravo Unit implicated a constitutionally protected liberty interest entitling her to a due process hearing.

 The TCF prison regulations themselves do not make clear whether they are equally applicable to pretrial detainees and convicted prisoners. In *Bell*, however, the Court reasoned that because a government has the authority to detain a person prior to trial, so too may the state "subject him to the restrictions and conditions of the detention facility so long as those conditions and restrictions do not amount to

punishment." 441 U.S. at 536-37. Therefore we read the TCF use of the word "inmate" in its prison rules as applicable to both petitioners in this case.

 According to TCF Rule 7.1.1.23.6, "major discipline" may be imposed upon an inmate at TCF for "[e]vidence of . . . contraband, or aiding in obtaining [the] same." In the current case, prison officials maintain, and Majhor admits, that she possessed and used a cellular phone inside the prison facility. Majhor argues, however, that she did not violate prison rules because TCF does not specifically enumerate a cellular phone as "contraband" and that such possession should therefore not be classified as a "major violation" within the meaning of the prison regulations. We disagree.

 Rule 7.1.1.4 lists "drugs, alcohol, burglary tools, or incendiary devices" as examples of contraband. Although the rules do not specifically include cellular phones, there is no suggestion that the list is exhaustive. Moreover, TCF policies regarding telephone use implicitly suggest that a cellular phone is contraband. Rule 7.1.1.23.1 states that apart from payphone telephone calls, inmates may be allowed to use TCF telephones for conversations limited to five minutes, and for the limited purposes of contacting an attorney or in the event of a serious family emergency. Possession of a cellular phone, however, would clearly violate this rule by allowing an inmate to make unauthorized personal calls not of an emergency or attorney/client nature for longer than five minutes.

 Perhaps more compelling, it does not require a great stretch of the imagination to realize that unauthorized, clandestine telephone communications made by prison detainees with the outside world or with other inmates implicates the security of the prison facility. For example, with unlimited cellular phone access, detainees can conspire in real time to plan their escape from the prison, to engage in criminal activity, or to cause a riot or disruption within the facility. Unlike a stationary phone, a cellular phone affords the advantage of maneuverability and secrecy, allowing conversations to be made at unauthorized times and away from a single, fixed, and readily observable location. Therefore, in light of existing prison regulations, and the dangers such phones pose to prison order and security, we do not hesitate to recognize cellular phones as "contraband" within the non-exhaustive list of prison rules.

 However, although we conclude as in *Collazo-Leon* that Majhor has not shown that the Warden's decision to transfer her to Bravo Unit for the violation of prison rules triggers a constitutional liberty interest entitling her to due process, Majhor alternatively maintains that her due

27

process rights were violated for failure of the prison to adhere to its own procedural rules which require a hearing prior to disciplining an inmate for "major violations" of prison rules.[2] In a civil rights action, a pretrial detainee has a right to due process not only where the conduct involves constitutionally impermissible punishment, but also where the conduct separately triggers a liberty interest created under the statutes, rules and regulations of the territory. *See, e.g., Martucci v. Johnson*, 944 F.2d 291, 294 (6th Cir. 1991). In the present case, however, petitioner has filed a habeas writ and not a civil rights action. As we have discussed above, in *Agasiva* we concluded that our habeas jurisdiction over issues raised concerning the conditions of confinement is limited to "exceptional circumstances rising to the level of constitutional deprivations." 6 A.S.R.2d at 38. Consequently, although we are very troubled by the fact that the Warden failed to follow required prison procedural hearings prior to taking disciplinary action against Majhor, we are unable to separately review any due process claims grounded on prison rules and regulations alone.

 In addition to the transfer to Bravo Unit itself, Majhor contends that the conditions within Bravo Unit were such that she was subjected to cruel and unusual punishment under the Eighth Amendment. U.S. CONST. amend. VIII; *see also* REV. CONST AM. SAMOA art. I, § 6. We first note that the Eighth Amendment applies only to the imposition of "cruel and unusual punishment" towards convicted prisoners. *See Ingraham v. Wright*, 430 U.S. 97 (1976). Thus, Majhor's claim regarding cell conditions in the Bravo Unit is cognizable as a due process claim which, as described in *Bell*, prohibits *all* punishment of pretrial detainees. *See also Demery v. Arpaio*, 378 F.3d 1020 (9th Cir. 2004). Nevertheless, although Majhor describes alleged fighting of inmates in

---

[2] Rule 7.1.1.24 reads as follows:

In the case of the aforementioned major violations, the following procedures will be followed to establish and implement a disciplinary board.

a. An in-house hearing will be conducted within one week of the charges being made and forwarded to the commander.

b. A hearing board of four must include one non-Corrections Divisions Department of Public Safety staff, and an Inmate Counselor. The hearing is to be chaired [by] the Commander or Assistant Commander.

c. The offender will be allowed to present evidence or witnesses on his behalf.

d. The offender will be allowed to confront and cross-examine witnesses on his behalf.

e. The hearing board will be required to find significant evidence of guilt before imposing additional sanctions.

nearby cells, and even an alleged breakout of another inmate from his cell, even were we to accept this as true, she indicates that she was never harmed, and nor was anyone physically able to enter her cell and cause her harm. Although Majhor indicates she was disturbed by the conduct of others, that she was kept free from harm's way during her disciplinary detention in Bravo Unit prevents such detention from rising to the level of punishment.

On the other hand, although we do not regard Majhor's past confinement in Bravo Unit as "punishment" under *Bell*, we take seriously her complaint regarding the present temperature and ventilation conditions in her cell upon her return from Bravo Unit to the general population. In *Anton v. Sheriff of DuPage County, Ill.,* a pretrial detainee claimed that the excessively cold temperature conditions in his cell amounted to punishment under the meaning of *Bell*. 47 F. Supp. 2d 993 (N.D. Ill. 1999). Recognizing that pretrial detainees are entitled to "the minimal civilized measure of life's necessities," the court determined that although pretrial detainees have a right to protection from extreme temperatures, temperature alone is insufficient for a successful conditions of confinement claim. *Id.* at 999 (quoting *Dixon v. Godinez,* 114 F.3d 640, 642 (7th Cir.1997)). Instead, to successfully challenge temperature conditions, courts should assess several factors, such as: the severity of the temperature; its duration; whether the pretrial detainee has alternative means to protect himself from the temperature; the adequacy of such alternatives; as well as whether he must endure other uncomfortable conditions as well as temperature. *Id.*

In the current case, although we lack actual temperature data, with outside territorial temperatures well into 80-90 degree range, the lack of ventilation as a result of boarding Petitioners' cells no doubt poses a high probability of heat-related illness and thus presents a substantial risk of serious harm to Majhor. In addition, with no indication that the blocked windows are only a temporary measure, and with constant high territorial temperatures, the duration of the present conditions does not appear to be short-term. Although Warden Kelemete maintains that the boarding is needed for the security of the inmates, and our goal is not to micromanage prison affairs, we conclude that if he wishes to continue this policy, he must simultaneously take additional measures to improve conditions to the levels they were prior to boarding the windows. Such measures may include providing Majhor with extra showers, ice, ice water, fans, or other similar such measures that provide adequate temperature reducing alternatives. *See Chandler v. Crosby,* 379 F.3d 1278 (11th Cir. 2004).

## B. Convicted Prisoners

██ Petitioner Ropati was disciplined for violation of Rule 7.1.1.23.6(h), which prohibits "[l]ewd acts on or outside Correctional Facility grounds," after allegedly exposing herself to other inmates. As with possession of contraband, the commission of a "lewd act" is regarded as a "major violation" under TCF rules, in turn triggering the procedural safeguards of Rule 7.1.1.24 prior to taking disciplinary steps.

██ Unlike the standard for government violation of a pretrial detainee's constitutional rights, the liberty interests of a convicted prisoner are different. In *Sandin v. Conner*, the Supreme Court observed that whereas punishment of pretrial incarcerated prisoners impermissibly imposes retribution in lieu of a valid conviction, in the case of a convicted prisoner, punishment merely "effectuates prison management and prisoner rehabilitative goals." 515 U.S. 472, 483 (1995). Thus, unlike the case with pretrial detainees, punitive action and "[d]iscipline by prison officials in response to a wide range of misconduct falls within the expected perimeters of the sentence imposed by a court of law." *Id.*; *see also Wolff v. McDonnell*, 418 U.S. 539, 555 (1974). The test of whether the official conduct violates the prisoner's rights, then, is not whether the conduct constitutes punishment, but whether the punishment given "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life" and "exceeds similar, but totally discretionary, confinement in either duration or degree of restriction." Applying this standard, Ropati is constitutionally entitled to due process for her alleged "lewd act," then, only when she can establish that upon being punished, her conditions of confinement were excessive. *Johnson v. Shovah*, 152 F.3d 918 (2d Cir. 1998); *Dupree v. L. Brown*, 2003 WL 23573439 at *5 (D. Md. 2003) (burden under *Sandin* on plaintiff to establish due process violations).

██ In the current case, we do not find Ropati's transfer to Bravo Unit problematic. We note that "a prisoner may be transferred [from the general population] for any reason, or for no reason at all" and has no liberty interest in remaining in the general prison population. *See, e.g., Thomas v. Ramos*, 130 F.3d 754, 760 (7th Cir. 1997). Because the evidence indicates Ropati was neither harmed nor able to be harmed, she has not demonstrated that she was subject to conditions in Bravo Unit that exceeded what a prison inmate could expect from confinement generally. Therefore, we do not find that the transfer constitutes a dramatic departure from the basic conditions of her sentence to constitutionally implicate her due process rights.

Moreover, although we once again find it troubling that the Warden did not adhere to the procedural requirements of Rule 7.1.1.24 prior to

instituting disciplinary action, as we described above, because this is a habeas action, and not a civil rights claim, we do not have jurisdiction to separately analyze whether Ropati's due process rights were violated under the "statutes, rules, or regulations" of the territory. *See Martucci*, 944 F.2d at 294.

As with Majhor, however, we do find the temperature conditions of Ropati's current confinement problematic and that the heat and lack of ventilation exceeds the minimal civilized measure of life's necessities that she may expect, even as a convicted prisoner. Similarly, then, we conclude that if the prison wishes to maintain its policy of boarding Ropati's windows for a legitimate governmental objective, it can do so only if it provides adequate alternative measures to reduce the temperature, including, but not limited to, additional showers, ice, ice water, and fans.

## Order

In accordance with our discussion above, we conclude with respect to both Majhor and Ropati that the transfer to Bravo Unit and the conditions within Bravo Unit were constitutionally proper, but that the present temperature conditions are excessive and must be modified by either removing the boarding or providing adequate heat-reducing alternatives. It is so ordered.